Eric VandeLinde (MD Bar No: 0912170259)
GREENSPOON MARDER LLP
201 International Circle, Suite 230
Hunt Valley, MD 21030
Phone:  (410) 891-5870
Facsimile: (954)  771-9264
Email:      Eric.VandeLinde@gmlaw.com

Adam G. Wasch (FL Bar No: 071082) (To be Admitted Pro Hac Vice)
David Camhi (FL Bar No: 1020689) (To be Admitted Pro Hac Vice)
Evan Goldman (NJ Bar No.: 4289-2012) (To be Admitted Pro Hac Vice)
GREENSPOON MARDER LLP
2255 Glades Road, Suite 400-E
Boca Raton, Florida 33431
Phone: (561) 939-2213
Facsimile: (561) 997-8494
Email:    Adam.Wasch@gmlaw.com
Email:    David.Camhi@gmlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF MARYLAND

| | |
|---|---|
| **MOHINANI GROUP, S.A., a Panamanian corporation; MA GROUP, S.A., a Guatemalan corporation; MULZEK INVESTMENT, S.A., a Uruguayan corporation; and MOHINANI GROUP GUATEMALA, S.A., a Guatemalan corporation,**<br><br>            **Plaintiffs,**<br><br>vs.<br><br>**PANDORA FRANCHISING, LLC, a Maryland Limited Liability Company; PANDORA JEWELRY LATAM, LLC, a Maryland Limited Liability Company**<br><br>            **Defendants.** | **CASE NO:**<br><br>**COMPLAINT FOR:**<br><br>1. **BREACH OF CONTRACT (COVENANT OF GOOD FAITH AND FAIR DEALING)**<br>2. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>3. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br>4. **UNJUST ENRICHMENT**<br>5. **UNFAIR COMPETITION**<br>6. **DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Mohinani Group, S.A., MA Group, S.A., Mulzek Investments, S.A., and Mohinani Group Guatemala, S.A., bring this civil action against Defendants, Pandora Franchising, LLC ("Pandora Franchise"), and Pandora Jewelry Latam, LLC ("Pandora Latam"), (unless specifically identified, collectively referred to as "Defendants" or "Pandora"), and allege:

## I.  **INTRODUCTION**

1.     This is an action by franchisees of Pandora against Pandora for breach of contract (the implied covenant of good faith and fair dealing), intentional interference with prospective economic advantage, and intentional interference with contractual relations, unfair competition, unjust enrichment, and conversion. Plaintiffs also seek a judicial declaration that remedy Defendants' fraudulent, unlawful, deceptive practices in connection with Pandora's scheme to take Plaintiffs' Pandora franchises for itself without just compensation and damages arising from Defendants' unscrupulous, unlawful, unfair and fraudulent conduct.

2.     Plaintiffs established the Pandora brand in Latin America through a substantial financial investment to build and operate their Pandora franchises, contribute to advertising the brand and develop a good reputation including local goodwill.  Through multiple actions and a scheme to convert Plaintiffs' stores and local goodwill as alleged herein, Defendants believe they can orchestrate false claims to default Plaintiffs under a false pretext to take away material benefits of the franchise agreements and avoid liability for breaching the covenant of good faith.

3.     A party's discretion must be exercised in good faith. Defendant is acting in bad faith.

## II. **PARTIES**

4.     Plaintiff, Mohinani Group, S.A., is a Panamanian corporation with its principal place of business in Panama.

5.    Plaintiff, MA Group, S.A., is a Guatemalan corporation with its principal place of business in Guatemala.

6.    Plaintiff, Mulzek Investments, S.A., is a Uruguayan corporation with its principal place of business in Uruguay.

7.    Plaintiff Mohinani Group Guatemala, S.A., is a Guatemalan corporation with its principal place of business in Guatemala.

8.    Each Plaintiff is a party to at least one written franchise agreement for a Pandora franchise.

9.    Defendant, Pandora Franchising, LLC, is a Maryland limited liability company. Its principal place of business is in Baltimore, Maryland. Its Managers (none are named as a party at this time), Matthew Scott, Siddharth Keswani, and Marie-Jose David, are all residents and/or citizens of the State of Maryland.

10.    Defendant, Pandora Jewelry Latam, LLC, is a Maryland limited liability company with its principal office in Baltimore, Maryland. Pandora Jewelry Latam, LLC is on information and belief the successor-in-interest, transferee and assignee of Pandora Franchising LLC's rights and obligations under certain or all of Plaintiffs' Franchise Agreements.  In September 2021, Defendants sent Plaintiffs a document purportedly showing that Pandora Franchising LLC assigned/conveyed/transferred its rights and obligations under the Franchise Agreements to Pandora Jewelry Latam LLC.  However, at the time of filing this Complaint, according to the online record of the Maryland Secretary of State, Pandora Latam LLC is not in good standing.

11.    Pandora Jewelry Latam, LLC's Managers are Matthew Scott, Siddharth Keswani, and Marie-Jose David. They are residents and/or citizens of the State of Maryland.

12.    Pandora Jewelry Latam LLC operates in Latin America. Its general manager in Panama is Martin Jaime Pereyra Rozas who resides in Panama City.

### III.   JURISDICTION AND VENUE

13.    The Court has subject matter jurisdiction based on 28 U.S.C. §1332(a), there being complete diversity of citizenship between the parties and the value of the claims exceeds $75,000, exclusive of interest and costs.

14.    This Court has supplemental jurisdiction over the claims for relief under Maryland law under 28 U.S.C. §1367(a) because the claims form one constitutional case, derive from a common nucleus of operative fact, are such that they would ordinarily be expected to be tried in one judicial proceeding, and judicial economy, convenience fairness and comity are advanced by trying these claims together as one case.

15.    Jurisdiction and venue is proper in this district under Section 13(B) of the Franchise Agreement in that Defendants agreed that any claim arising out of or relating to the franchise agreements or breach of the franchise agreements would be brought in this Court (Fr. Agrmt. §13B). Furthermore, all Defendants are citizens and residents of the State of Maryland.

16.    Venue is proper in this District for additional reasons.  This is a district in which, under 28 U.S.C. §§ 1391(b)(1), 1391(b)(2), and 1391(c)(2), a substantial part of the events giving rise to the claims occurred in this District and all Defendants are residents of the State. It is from Defendants' headquarters in this District that communications and demands to Plaintiffs take place.  Furthermore, and execution of the Agreements occurred in Maryland; and the parties agreed that any suit, action or legal proceeding arising out of or relating to the franchise agreements would be brought in this Court.  Defendants have sufficient connection with the District of Maryland to make venue proper in this District.

17.    Plaintiffs are not ignoring that several Franchise Agreements provide for mediation.  However, most of them do not require mediation.  Moreover, the interconnection between the actions and omissions of the various defendants makes the mediation provision futile because the claims against all Defendants

- 4 -
COMPLAINT

1  must be considered together, and Defendant Pandora Franchising LLC is not a

2  party to a mediation agreement based on a purported assignment to Pandora Latam

3  LLC, signed by Mr. Pereyra, on September 1, 2021. Here is a screen shot of the of

4  the September 1, 2021 letter:

COMPLAINT

1
2
3    18.    Thus, it is necessary to state in this complaint, the allegations against
4    all Defendants. Moreover, the mediation provision is buried deep within a long
5    pre-printed form agreement that was presented on a take-it-or-leave-it basis and
6    has as its effect, delay and increased cost to seek relief. The procedural and
7    substantive surprise and cost and other aspects make the provision unconscionable.
8    Without waiving these defenses to mediation, each Plaintiff is willing, subject to
9    any requirements of the Court, to defer formal service of the Complaint on
10   Defendants and provide a courtesy informational copy of this document together
11   with a request to commence mediation and thus defer commencement of the
12   litigation against Defendants pending a mediation.
13   19.    The Franchise Agreements provide for arbitration.  Plaintiffs waive
14   arbitration and elect to proceed in this Court.  If Defendants elect to arbitrate by
15   commencing an arbitration on the claim according to the arbitration provision in
16   the Franchise Agreements, Plaintiffs anticipate cooperating in and participating in
17   the arbitration. Whether the action proceeds in this Court or in arbitration,
18   Plaintiffs reserve the right to seek provisional relief in aid of litigation and/or
19   arbitration.

## IV.  BACKGROUND

### The Franchise Agreements

22   20.    On or about October 25, 2013, Plaintiff Mohinani Group, S.A.
23   ("MG") entered into a Franchise Agreement with Defendant Pandora Franchising
24   LLC for a Pandora store at Tucumen Airport in Panama ("Location # 476").  A
25   copy of the Franchise Agreement is attached to this Complaint as Exhibit A.
26   21.    On or about October 25, 2013, MG entered into a Franchise
27   Agreement with Pandora Franchising LLC for a Pandora store at Allbrook Mall in

1   Panama ("Location #510"). A copy of the Franchise Agreement is attached to this

2   Complaint as Exhibit B.

3          22.    On or about October 25, 2013, MG entered into a Franchise

4   Agreement with Pandora Franchising LLC for a Pandora store at Multiplaza Mall

5   in Panama ("Location #530"). A copy of the Franchise Agreement is attached to

6   this Complaint as Exhibit C.

7          23.    On or about June 2, 2014, MG entered into a Franchise Agreement

8   with Pandora Franchising LLC for a Pandora store at the Metromall in Panama

9   ("Location #608").   A copy of the Franchise Agreement is attached to this

10  Complaint as Exhibit D.

11         24.    On or about January 11, 2016, Plaintiff MG entered into a Franchise

12  Agreement with Pandora Franchising LLC for a Pandora store at Entre Avenida

13  David-Chiriqui, Panama ("Location #672").  A copy of the Franchise Agreement is

14  attached to this Complaint as Exhibit E.

15         25.    On or about January 11, 2016, Plaintiff MG entered into a Franchise

16  Agreement with Pandora Franchising LLC for a Pandora store at Via Centenario,

17  in Panama City, Panama ("Location #673").  A copy of the Franchise Agreement is

18  attached to this Complaint as Exhibit F.

19         26.    On or about October 19, 2017, Plaintiff MG entered into a Franchise

20  Agreement with Defendant Pandora Franchising LLC for a Pandora franchise at

21  "Town Centre," Nivel r2, Space R2-214, Costa del Este, Panama City, Panama

22  ("Location #765"). A copy of the Franchise Agreement is attached to this

23  Complaint as Exhibit G.

24         27.     On or about May 8, 2017, Plaintiff MA Group, S.A. entered into a

25  Franchise Agreement with Defendant Pandora Franchising LLC for a Pandora

26  store at Oakland Mall in Guatemala City, Guatemala ("Location #753"). A copy of

27  the Franchise Agreement is attached to this Complaint as Exhibit H.

28

COMPLAINT

28.     On or about October 19, 2017, Plaintiff MA Group, S.A., entered into a Franchise Agreement with Defendant Pandora Franchising LLC for a Pandora store at Miraflores Mall in Guatemala City, Guatemala ("Location #799"). A copy of the Franchise Agreement is attached to this Complaint as Exhibit I.

29.     On or about November 6, 2017, Plaintiff Mulzek Investment, S.A. ("Mulzek") entered into a Franchise Agreement with Defendant Pandora Franchising LLC for a Pandora store at Punta Carretas Shopping in Montevideo, Uruguay ("Location #859"). A copy of the Franchise Agreement is attached to this Complaint as Exhibit J.

30.     On or about November 8, 2017, Plaintiff Mulzek entered into a Franchise Agreement with Defendant Pandora Franchising LLC for a Pandora store at Punta Shopping in Punta del Este, Uruguay ("Location #853"). A copy of the Franchise Agreement is attached to this Complaint as Exhibit K.

31.     On or about November 19, 2018, Plaintiff MA Group entered into a Franchise Agreement with Defendant Pandora Franchising LLC for a Pandora store at Mall Pradera Concepcion in Santa Catarina Pinula, Guatemala (Location #137).

32.     On or about July 22, 2019, Plaintiff MG entered into a Franchise Agreement with Defendant Pandora Franchising LLC for a Pandora store at Panama City Tucumen Airport Terminal 2 ("Location #802"). A copy of the Franchise Agreement is attached to this Complaint as Exhibit M.

33.     On or about December 3, 2019, Plaintiff Mohinani Guatemala, S.A., entered into a Franchise Agreement with Defendant Pandora Franchising LLC for a Pandora store in Naranjo Mall, Guatemala.

### *Pandora's Scheme to Take-Over Plaintiffs' Pandora Franchises*

34.     Rajesh Mohinani ("Mr. Mohinani") is the operating principal of each of Plaintiffs' Pandora franchises and a personal guarantor on each signed Franchise Agreement.

35.    Plaintiffs were the first to bring the Pandora brand into the Latin American market and invested money and worked hard for nearly a decade to develop Pandora franchises throughout Panama, Guatemala, and Uruguay, earning multi-millions in U.S. dollars of gross revenue, purchasing directly from Pandora millions of dollars' worth of jewelry for re-sale at its stores, investing millions of dollars in marketing and training to promote the Pandora brand and generating hundreds of thousands of U.S. dollars to Pandora in fees. Plaintiffs invested approximately $5 million in the development and build-out of their stores which consistently performed in the top tier of Latin America Pandora stores. In fact, as of May 16, 2022, Defendants' General Manager of Latin America, Mr. Pereyra, issued his bi-weekly "Pandora Latam in a Minute" video which is sent to all Pandora Latin America franchisees and three of the top ten highest earning Pandora stores in Latin America belonged to Plaintiffs.  This was affirmed 15 days later on May 30, 2022, when Mr. Pereyra announced that two of the top ten highest earning Pandora stores in Latin America belonged to Plaintiffs.

36.    In or about April 2021, Defendants, through Mr. Pereyra, hatched a plan to pilfer Plaintiffs' multi-million-dollar network of Pandora stores for Pandora's pecuniary gain without paying Plaintiffs just compensation for the stores. This plan, if it came to fruition as conceived by Defendants, would have resulted in - and threaten to result in - Pandora's takeover of the multi-million dollar network of Pandora locations and its 80-plus employees being terminated on or about July 1, 2022, without paying Plaintiffs a dime. It would be like at an attempt at contractual theft of the business Plaintiffs built and operated.

37.    Specifically, Pandora's scheme commenced on or about February 15, 2021 when, despite Plaintiffs providing bi-monthly updates, as well as offers of unlimited access to any and all litigation investigations and payment of all legal expenses arising from the review of these documents, with regard to an unrelated personal litigation between Mr. Mohinani and his wife in Panama, and knowing

COMPLAINT

1  that Plaintiff Mohinani Group operates stores in multiple franchise brands

2  throughout Latin America, Pandora issued a sweeping demand for financial

3  information and documentation related to Plaintiffs' commercial invoices, import

4  declarations, custom clearance documents, company structure, dividends paid or

5  received, capital movements, Tocumen Airport tendering process documents,

6  vendor and customer master data lists, bank reconciliations, and sequential number

7  of checks issued from 2017 to 2020.

8      38.    On or about March 5, 2021, Plaintiffs provided financial statements in

9  good faith including a detailed and itemized list of information and responses to

10  the requests. No immediate response was provided by Pandora Franchise to

11  Plaintiffs' correspondence, and additional updates were provided by Plaintiffs to

12  Pandora Franchise every two weeks until February 2022 without issue.  Plaintiffs

13  complied with reporting requirements.

14      39.    Meanwhile, unknown to Plaintiffs, on or about April 16, 2021,

15  Pandora Franchise and/or Mr. Pereyra, as an officer of Pandora, formed and

16  incorporated Pandora Jewelry Panama Retail, S.A. ("Pandora Retail").  The below

17  image showing a business entity detail of Pandora Retail is from the Public

18  Registry of Panama website:

19



28

(MERCANTIL) Folio Nº 155704926                                                    ×

| Datos Generales | Elementos Activos | Prelación | Miembros Relacionados |

| Cargo | Miembro |
| --- | --- |
| Agente Residente | PATTON, MORENO & ASVAT |
| Director / Presidente | KHATIYA ASVAT PATEL |
| Director / Tesorero | EBRAHIM ASVAT KASU |
| Director / Secretario | ANA EVELINA CORDOVEZ DIAZ |
| Suscriptor | ILVIS KENNION AVILA |
| Suscriptor | IVAN ALEXIS ITURRALDE MORENO |
| REPRESENTANTE | EL PRESIDENTE SERA EL RERPESENTANTE LEGAL DE LA SOCIEDAD Y EN SU AUSENCIA LO SERA EL SECRETARIO. |

1

🖶 Imprimir

40.     On or about August 15, 2021, Plaintiff Mohinani Group's high ranking employee Fabiola Tapia abruptly, after eight years of employment at Plaintiff Mohinani Group, quit her employment foregoing thousands of dollars in severance pay "to dedicate time to herself."  Plaintiffs are informed and believe and thereupon allege that Ms. Tapia was recruited by Mr. Pereyra and Anny Cordovez ("Ms. Cordovez"), the second-in-command to Mr. Pereyra, to quit working for Plaintiff Mohinani Group and to work for Pandora Latam and Pandora Retail. Ms. Tapia is currently employed by Pandora as the Territory Manager in Panama for Pandora. Pandora never notified Plaintiffs of Ms. Tapia's role as Territory Manager even though Mr. Mohinani had the only seven stores in the territory. Plaintiffs learned of Ms. Tapia's role via LinkedIn.

41.     On or about February 18, 2022, Mr. Mohinani received a letter from the Tocumen International Airport giving requesting and authorizing that Plaintiff Mohinani Group start building out the Pandora store, Location #802, in the newly inaugurated Terminal 2 after the restrictions lifted from the COVID-19 pandemic. Three days later, on February 21, 2022, Mr. Mohinani wrote to legal counsel for Pandora and Mr. Pereyra, memorializing a conversation had between them and requesting their support and authorization to start construction on the Terminal 2

COMPLAINT

Pandora store. Mr. Mohinani memorialized the issues causing delay beyond Plaintiffs' control including that the Panamanian government terminated its agreement with Brazilian contractor Norberto Oldebrecht S.A., the Brazilian subcontractor, who failed to complete build out of the new construction and, once the terminal was inaugurated, there were construction defects including floods. After the issues were addressed, the Covid-19 pandemic started further delaying construction. Tocumen International Airport officials informed Mr. Mohinani that during the pandemic in 2020 and 2021, Tocumen International Airport did not allow any concession owners to do any work on their stores. Mr. Mohinani reasonably requested that the effective date of the Franchise Agreement be extended to February 15, 2022, so that the franchise store could be built in compliance with government regulations. Mr. Mohinani told Mr. Torres and Mr. Pereyra that airport officials requested a response within 15 days.

42.    On February 24, 2022, and in response to Mr. Mohinani's reasonable request for time to build out Location #802, Mr. Pereyra made his first brazen attempt to default one of Plaintiffs' Franchise Agreements. Mr. Pereyra signed a letter on Pandora Latam letterhead entitled "Notice of Termination of Franchise Agreement Tocumen Airport Terminal 2 store." Mr. Pereyra advised Plaintiff Mohinani Group that Pandora was terminating Location 802 because Section 2(C) required the franchisee to open within 180 days from the Effective Date despite the letter from three days prior and the fact that the delays at Tocumen International Airport Terminal 2 were public knowledge as the delays were covered by local media and newspapers, to wit:



43.    Mr. Pereyra knew or reasonably should have known, beyond doubt, that Plaintiff Mohinani Group could not open Location #802 prior to the expiration of the prescribed time limit because Terminal 2 was not open and the store location had not been delivered to Plaintiff Mohinani Group by Tocumen International Airport.

44.    On or about April 8, 2022, Mr. Mohinani, Mr. Pereyra, and counsel for Plaintiffs and Defendants participated in a meeting in Panama at the offices of Pandora Retail, Pandora Latam (the purported new franchisor) and Pandora Jewelry Panama, S.A. (which, on information and belief is a corporation used by Mr. Pereyra and Pandora to avoid taxes for activity in other Latin American countries). During the meeting, Plaintiffs learned for the very first time unrevealed information that the relationship between Plaintiffs and Pandora was over, that Plaintiffs' operation in Panama would be taken over directly by Pandora, that Plaintiffs would have 120 days to finalize the sale of their profitable stores in Guatemala and Uruguay to pre-approved buyers and the deal would need to be accepted within 10 days or Pandora would terminate all of the Franchise Agreements. Pandora had Plaintiffs execute an NDA in advance of this meeting. Plaintiffs were aware that Panamanian law requires a Panamanian citizen to own a

COMPLAINT

1   Pandora retail store and that Pandora is not a Panamanian citizen. Plaintiffs'

2   research tended to confirm that Pandora Retail was created to take over and operate

3   Plaintiffs' stores.

4      45. Within hours of this meeting's conclusion, Mr. Pereyra emailed to Mr.

5   Mohinani a short list of only three approved buyers.

6      46. On April 29, 2022, Mr. Pereyra forwarded three Notices of Default to

7   Plaintiffs. The purported Notices of Default contained, for the first time, multiple

8   defaults asserted and ten days to cure the default or face termination.  In these

9   notices, Pandora manufactured another basis of default that, under Sections 3(B)

10  and 11(C) of each Franchise Agreement "Franchisee is prohibited from engaging

11  in any conduct that might injure the goodwill associated with Franchisor's marks."

12  The letter further falsely asserts that Mr. Mohinani failed to deliver tax returns and

13  accounting information which was provided to Pandora Latam.  Plaintiffs and Mr.

14  Mohinani kept Pandora Franchise and Pandora Latam and their legal counsel fully

15  apprised of the facts and evidence to support his defense to false allegations against

16  him bi-monthly. The purported default notices falsely claimed that Mr. Mohinani

17  damaged Pandora's trademarks and reputation. To the contrary, Mr. Mohinani's

18  Pandora stores were achieving a healthy recovery post-pandemic with purchases,

19  sales, store traffic, and store conversions beyond Pandora's expectations and

20  outperforming most franchised Pandora stores in Latin America. This recovery

21  gained Mr. Pereyra public recognition on May 16, 2022, and May 30, 2022,

22  through his "Pandora Latam Minute" videos.

23     47. Mr. Pereyra gave Mr. Mohinani 10 days to respond including to

24  provide documents that were already in Defendants' possession that Plaintiffs had

25  provided to Defendants over the years, again, without issue.  Plaintiffs' cures and

26  efforts to cure the purported defaults were never enough. Over the years, Plaintiffs

27  provided their financial statements, which were responded to with accusations

28  rather than working toward a resolution.  Mr. Pereyra further ordered a better

COMPLAINT

response to the financial request for information that had been responded to without issue in February 2021. In response to the ultimatum from Mr. Pereyra, Plaintiffs offered to cure the asserted defaults.  Instead of working with Plaintiffs, however, Defendants began cutting off access to the technology stack utilized in operating Pandora stores making Plaintiffs a franchisee in name only, but having to pay marketing fees without the benefit of the franchisee services.

48.     During the cure period of this notice, Pandora, through its local legal counsel in Panama, Khatiya Asvat Patel, filed the necessary paperwork so that the new company formed by Pandora back in April 2021 "Pandora Jewelry Panama Retail, S.A.," referred to as "Panama Retail" herein, could commence retail sales in Panama and formally take over operation of Plaintiffs' Pandora franchise stores in Panama as of July 1, 2022. Specifically, this notice advised the government of Panama that Pandora Retail, a company formed by Mr. Pereyra and/or Pandora with the same principal address Pandora Latam and Pandora Jewelry Panama, S.A. and the same principal officer Ms. Cordovez, would be starting operation of Plaintiffs' Pandora franchise stores (which were operating pursuant to valid Franchise Agreements) on July 1, 2022. Defendants never mentioned Pandora Retail's existence to Plaintiffs.

49.     On or about May 13, 2022, Plaintiffs' counsel sent a letter stating that Pandora Franchise and Pandora Latam were provided all material and facts going back three (3) years concerning the marital dissolution between Mr. Mohinani and his wife. The response identified Pandora's attempts to take over Mr. Mohinani's network of Pandora franchise stores as was told directly to his face by Mr. Pereyra as General Manager of Pandora Latam during a meeting on April 8, 2022, at Pandora Latam, Pandora Jewelry Panama, S.A.  and Pandora Retail's offices in Panama City, Panama and through Defendants' unannounced secretly planned visits to the stores by personnel to learn the business practices of Plaintiffs. As to the sweeping demand for information and financial documents made in February

2021 and in April 2022, Plaintiffs' counsel reminded Pandora that the CHARM system (administered and owned by Pandora) provides all operating aspects including sales, purchases, returns, inventory, price, discounts, sales taxes, etc. and provides that to Defendants with direct and real-time access to all of the reasonable information requested. Furthermore, Plaintiffs promptly provided the requested tax returns and financial statements and requested the legitimate and rational basis for requesting the other documents that were not operational in nature or related to Plaintiffs' Pandora stores' performance.

50.     Plaintiffs have never received a response as to this request.

**Pandora Conjures Up Financial Defaults and Blocks Access to Credits**

51.     Pandora Franchise and Pandora Latam provides COOP credits based on the purchases from the previous year to Pandora franchisees in the amount of 5% of the previous years' purchases. As of May 2022, Pandora confirmed with Plaintiffs that the Panama stores had a COOP credit available to them in the amount of $130,391.84. Plaintiffs' Guatemala operation had a credit of $98,673.49 to apply. Plaintiffs' Uruguay operation had $20,713.84. The total COOP credit available to Plaintiffs was $249,779.17.

52.     Pandora also provides a return credit to franchisees including Plaintiffs calculated as 6% of the previous years' purchases to allow for franchisees to return goods if they are defective or slow on rotation. Plaintiffs would routinely fill out a Pandora document provided and would ship the goods to Pandora to receive the credit. As of May 2022, Plaintiffs had $128,478.99 in credit to apply in Guatemala; $26,192.02 in credit to apply in Uruguay; and a $65,497.72 balance in credit to apply in Panama. The total defective merchandise credit available for Plaintiffs' use was $220,168.73.  On or about May 25, 2022, Pandora cut-off each Plaintiff's access to its Pandora Cloud system, through which these credits are applied in favor of Plaintiffs' accounts, therefore precluding Plaintiffs from applying these amounts to their open credit line with Pandora.

53.    According to Pandora's "Merchandising Product & Planning Department", sales at Plaintiffs' stores in 2021 increased approximately 31% from 2020 and store traffic was up 35% from 2021 in Panama.  Every year, Pandora and Mr. Mohinani would meet in or around October to determine the amount of inventory Plaintiffs would need to purchase for their franchises (a.k.a. "SELL IN") and the amount of product Mr. Mohinani would need to sell in his stores (a.k.a. "SELL OUT").  At the end of 2021, having no real choice as to terms, Mr. Mohinani Plaintiffs agreed to lofty inventory purchases in Panama.  Pandora had far stronger bargaining power because unless the Plaintiffs acceded to Defendants terms the Plaintiffs would lose their investment in the Pandora stores. Normally minutes were prepared by Pandora and signed by the parties, but no such formalities were undertaken at the October 2021 meeting. In January 2022, Pandora issued "The Replenishment" purchase figures which was an increase of SELL IN that was forced upon Plaintiffs. Sales and Managing Director for Pandora Latam, Ms. Cordovez, sent Mr. Mohinani an email stating that Pandora was requiring an increase in the amount of goods Plaintiffs must purchase.

54.    The imposed purchase requirements as part of the 2022 "Replenishment" required Mr. Mohinani to purchase an additional $857,290 in Panama in 2022, and, by May 2022, Plaintiffs had already purchased $280,497.40 toward the Replenishment. Pandora required Mr. Mohinani to purchase $512,050 extra in inventory even though he had already paid $39,798.70 of the Replenishment. Mr. Mohinani's Uruguay stores were required to purchase an extra $241,780:

| Stock ideal | Dif Units | Dif USD WH |
|---|---|---|
| 33,800 | 14,630 | 512,050 |
| 6,500 | 3,232 | 113,120 |
| 9,000 | 3,780 | 132,300 |
| 7,500 | 3,887 | 136,045 |
| 10,800 | 3,731 | 130,585 |
| 75,500 | 24,494 | 857,290 |
| 4,000 | 1,233 | 43,155 |
| 7,500 | 1,562 | 54,670 |
| 8,500 | 4,260 | 149,100 |
| 7,500 | 2,820 | 98,700 |
| | | |
| 13,000 | 4,265 | 149,275 |
| 7,500 | 1,687 | 59,045 |
| 7,500 | 2,214 | 77,490 |
| 7,000 | 2,688 | 94,080 |
| 9,000 | 2,217 | 77,595 |
| 4,000 | 1,548 | 54,180 |
| 20,500 | 6,908 | 241,780 |
| 6,500 | 1,802 | 63,070 |
| 7,500 | 943 | 33,005 |
| 6,500 | 4,163 | 145,705 |
| 129,800 | 46,032 | 1,611,120 |

PANDÓRA

55.     As of May 2022, Plaintiff Mohinani Group was 2% over the SELL OUT (items sold) and 24% over in SELL IN (items purchased from Pandora).

56.     On May 19, 2022, despite the credits available to Plaintiffs and the forced inventory purchase above what was commercially attainable, Mr. Pereyra and Pandora acted to remove Plaintiffs and Mr. Mohinani from his network of successfully operating Pandora franchises without paying for them by issuing another Notice of Default. The two purported notices of default claimed "non-payment of sums" due in the amount of $70,990.27 for invoices of excess inventory forced upon Mulzek for its locations; and $715,348.50 for invoices of excess inventory forced upon Plaintiff Mohinani Group for its locations which were sold to Plaintiffs on credit terms.

57.     On or about May 24, 2022, without any notice, Pandora cut off Plaintiffs' credit terms for purchasing product via email from Ms. Cordovez for alleged delinquent payments.

58.     Three days later, on May 27, 2022, Plaintiffs Mulzek and Mohinani Group responded stating that their credit terms have been established practice for the entire franchise relationship, these Plaintiffs have been purchasing products on a revolving credit basis and, that over the course of the franchise relationship across Plaintiffs' Pandora stores in Latin America, informed Plaintiffs

1  understanding when agreeing to purchase requirements that allowed invoices to
2  remain open for 80 to 240 days.

3      59.      On or about June 1, 2022, Pandora threatened termination of Location
4  #802 despite that the delay was beyond Plaintiffs control and was caused by
5  government of Panama's inability to deliver the space from the outset was not a
6  force majeure event after Pandora approved the space knowing this was a new
7  terminal that had not been built yet and even though Section 17(G)(v) of the
8  Franchise Agreement expressly states that failure of performance by causes that
9  include failure of a government or public authority to grant a necessary license or
10 consent would be excused.

11     60.      Pandora acted with a coded animus taking away access to system
12 wide assistance. On or about June 6, 2022, Plaintiffs sent Ms. Cordovez an email
13 requesting to send more defective goods back but the email could not be delivered
14 because Pandora blocked access to the Pandora Cloud system (administered and
15 operated by Pandora). Plaintiffs have been denied access to the system since May
16 2022.

17                    ***Purported Termination of Franchises***

18     61.      On or about June 7, 2022, Pandora sent a letter to Plaintiffs stating
19 that that all the above Franchise Agreements are terminated. The letter claims
20 Plaintiff Mohinani Group failed to pay amounts due to Pandora.  The claims are
21 false.  Between January 1, 2022, and June 6, 2022, Plaintiff Mohinani Group paid
22 Pandora Franchise approximately $1,448,306.57 and had ample COOP and
23 defective-good-return credits to cover the alleged delinquent payments. Pandora
24 purported to terminate the Uruguay and Guatemala Franchise Agreements under
25 the cross-default sections in the Franchise Agreements.  Defendants did not have
26 grounds for early termination under any of the Franchise Agreements. Defendants
27 did not state accurate reasons for termination in a written notice of termination.
28 The reasons stated in the termination notice, whether or not valid had they been

accurate, were not accurate.  Defendants did not commit a material violation of any law, ordinance, rule or regulation. Plaintiffs did not do any of these.  Even if Defendants attempt to identify and claim Plaintiffs did any of these, such actions, viewed in the context of the system of franchises, and the absence of prior notice to Plaintiffs, shows they were not unfavorable to Defendants' operation and reputation and were not material.  Even if any such occurrences took place, an occurrence with regard to one Franchise Agreement is not grounds for termination of the other or of all Franchise Agreements.

62.     After purporting to terminate the Franchise Agreements, Mr. Pereyra demanded that Mr. Mohinani immediately transfer all leases of Plaintiffs' stores in Panama, and the telephone numbers, furniture, showcases, and lighting at Plaintiffs stores at Plaintiffs' sole cost and expense so that Pandora Retail may operate the stores as of July 1, 2022, as was planned by Mr. Pereyra and Pandora back in April 2021 despite the plan being illegal under Panama's Constitution Article 293 restrictions of what companies may engage in retail trade in that country.

63.     Despite Plaintiffs' compliance after the purported termination, Mr. Pereyra has sent harassing letters to Plaintiffs' landlords to terminate Plaintiffs leases without any legal justification. Claiming to be a representative of only Pandora Jewelry Panama, S.A., and Pandora Franchise (but, oddly enough, not the Pandora franchisor Pandora Latam LLC), Mr. Pereyra approached the Panamanian government demanding that the government hand over the rights to Plaintiffs' location at Terminal 2. Mr. Pereyra has engaged in a campaign of sending letters to malls in Panama, Guatemala and Uruguay damaging Plaintiffs' relationships with these malls to the point of irreparability. The actions of Mr. Pereyra and Defendants have harmed the goodwill Mr. Mohinani and his employees have developed in other stores in these malls. As recently as June 29, 2022, Plaintiff Mulzek received a letter from the administrator of "Montevideo Shopping Center"

1   which indicated that the landlord intends to terminate the lease. The letter referred

2   to the letter sent by Mr. Pereyra on behalf of Pandora Jewelry Panama, S.A.

3       64.     Not content with Plaintiffs' insistence on receiving just compensation

4   for their inventories, stores and other assets, Mr. Pereyra, acting on behalf of

5   Pandora Franchise, Pandora Latam, Pandora Jewelry Panama, S.A. and/or Pandora

6   Retail embarked on a media campaign in Guatemala, Uruguay and Panama intent

7   on devaluing the assets of Plaintiffs and coercing Plaintiffs into unbalanced

8   negotiations between the parties. Pandora has continuously sponsored, for over 30

9   days, news articles in mainstream media outlets in Panama, Uruguay and

10  Guatemala in which they indicate that "In the coming months Pandora will open

11  our own stores, operated and administered by the brand directly." This is a direct

12  violation of Panama's constitution, illegal and causes a devaluation to Plaintiffs'

13  interest in selling the store and assets for value and, with that, Mr. Pereyra and

14  Pandora completely closed 14 stores in three (3) countries putting many dozens of

15  jobs and millions in value at risk.

16      65.     On or about June 10, 2021, which was weeks after unilaterally

17  terminating Plaintiffs' credit terms and several days after terminating the franchise

18  relationship with Plaintiffs, Pandora Latam sent Plaintiffs Mohinani Group and

19  Mulzek a total of six separate invoices, on credit terms, totaling approximately

20  $21,000 two of which were paid by Plaintiffs yet Pandora failed to send the

21  inventory purchased to either Plaintiff. Plaintiffs retained the undersigned counsel

22  and have agreed to pay and are paying counsel a reasonable fee for providing

23  representation in this case.

24      ***Plaintiffs Alleged Violation of Post-Termination Obligations***

25      66.     Defendant claims that it has properly terminated each Franchise

26  Agreement with Plaintiffs and that, as a result thereof:

27

28

COMPLAINT

A.   Each Plaintiff is required to cease operating the franchise businesses; cease using the Pandora System; and cease using the Pandora Marks and trade dress;

B.   The Plaintiffs, at their own expense, is required to alter, modify, and change both the exterior and interior appearance of Plaintiffs stores so they would be clearly distinguished from the standard appearance of a Pandora jewelry store;

C.   That the Plaintiffs cannot, for a period of one year after the purported termination, on its own account or as an employee, principal, agent, independent contractor, consultant, affiliate, licensee, partner, officer, director, or owner of any other person, firm, entity, partnership or corporation, own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in or assist any person or entity engaged in any jewelry store located within fifteen miles of Plaintiffs franchise locations; within fifteen miles of any other Pandora jewelry store.

67.   Plaintiffs contend that Defendants anticipatorily breached the Franchise Agreement, that none of the Franchise Agreements were properly terminated and that the proper termination of those agreements is a condition precedent to the alleged post-termination requirements.

68.   Plaintiffs further contend that the restrictive covenants in the non-compete language in the Franchise Agreements are overreaching, overbearing, draconian, and unenforceable.

## COUNT 1:  BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (AGAINT PANDORA LATAM LLC)

69.   Paragraphs 1 through 68 are re-alleged as if fully set forth herein.

70.   Plaintiffs and Defendant Pandora Latam LLC are parties to written Franchise Agreements concerning the operation of franchises known as Pandora Jewelry, as follows:

A.      Franchise Agreement for franchise Location #476

B.      Franchise Agreement for franchise Location #510

C.      Franchise Agreement for franchise Location #530

D.      Franchise Agreement for franchise Location #608

E.      Franchise Agreement for franchise Location #672

F.      Franchise Agreement for franchise Location #673

G.      Franchise Agreement for franchise Location #753

H.      Franchise Agreement for franchise Location #765

I.      Franchise Agreement for franchise Location #799

J.      Franchise Agreement for franchise Location #853

K.      Franchise Agreement for franchise Location #859

L.      Franchise Agreement for franchise Location #802

M.      Franchise Agreement for a franchise location in Naranjo, Guatemala.

N.      Franchise Agreement for a franchise location in Santa Catarina Pinula, Guatemala

71.     The Franchise Agreements include a covenant of good faith and fair dealing.  Under this covenant Defendants cannot take action that undermines the benefit of the agreements.

72.     Within three years before the filing date of this Complaint, Pandora Latam and/or Pandora Franchise orchestrated a default under false pretext and taking and forfeiting an estimated $59,500,000.00 of sales and estimated $31,836,000.00 of value from Plaintiffs' stores.  These actions undermine the benefit of the agreements.

73.     Defendant is breaching the covenant of good faith.

74.     Plaintiffs performed all obligations under the agreements and if any was not performed it was excused.

75.     Defendant's actions are breaching and will breach and are causing and will cause damage to Plaintiffs.

76.     Plaintiffs have suffered and will continue to suffer lost profits, increased costs, lost market share, reputational harm, and other consequential damages in amounts to be proved at trial.

77.     Much of the harm to Plaintiffs is irreparable and further irreparable harm would result from Defendants establishing corporate stores at the Plaintiffs franchise locations, therefore Defendants and all persons acting in concert with or assisting Defendants should be enjoined and restrained from doing so.

78.     Under Section 13(C) of the franchise agreements, the prevailing party is entitled to recover reasonable attorney's fees and costs. Plaintiffs request reasonable attorney's fees and costs.

**COUNT 2: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(AGAINT ALL DEFENDANTS)**

79.     Paragraphs 1 through 68 are re-alleged as if fully set forth herein.

80.     Plaintiffs have established business relationships with identified or identifiable customers.

81.     Plaintiffs have a long history of doing business with those customers, good relations with the customers and the reasonable expectation of continuing to do business with the customers.

82.     Defendants know of these relationships.  It is Defendants' knowledge of these relationships and expectation of Plaintiffs' continuing to do business with them, and the success of Plaintiffs' stores that is motivation for Defendants to take over the stores, specifically to appropriate and forfeit to Defendants, Plaintiffs' relationship with Plaintiffs' customers.

83.     Within three years before the filing date of this Complaint, Defendants are interfering with Plaintiffs' established relations with the customers, by taking improper actions for the purpose and with the intent and effect of appropriating to themselves, the customers and customer relationships and

patronage and business that Plaintiffs invested in, developed, and established.

84.     Defendants' actions and conduct are wrongful by a measure other than the actions viewed by themselves.  Defendants' actions are wrongful independently as:

a.  being in breach of the covenant of good faith between the parties;

b.  additionally and alternatively, unethical, unfair, unconscionable actions, in violation of Maryland's common law of unfair competition and Panama's Constitution Article 293;

c.  additionally and alternatively, wrongful due to Defendants misuse of confidential, trade secret statistical, sales and other operational information that was provided to Defendants for Defendants' use to assist Plaintiffs, not to use to compete against and take away business from Plaintiffs.

85.     Defendants are causing damage to Plaintiffs.

86.     Plaintiffs have suffered and will continue to suffer lost profits, increased costs, lost market share, and other consequential damages in amounts to be proved at trial.

87.     Defendants acted with oppression, fraud and malice, justifying punitive damages.

## COUNT 3:  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

### (AGAINT ALL DEFENDANTS)

88.     Paragraphs 1 through 68 are re-alleged as if fully set forth herein.

89.     Since the inception of the Lease Agreements, each Defendant has been aware of the agreements.

90.     Within three years before the filing date of this Complaint, Defendants' agents instructed the landlords to terminate the Lease Agreements for each of Plaintiff's Pandora stores. Defendants thereby acted with the intent to disrupt the contractual relationship between Plaintiffs and the landlord and further

knew that a disruption to the relationship was certain or substantially certain to occur as a result of its conduct.

91.    There was no justification for the interference by Defendants' agents.

92.    As a direct and proximate result of Defendants intentional interference, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

93.    The conduct of Defendants as alleged herein was willful, oppressive, malicious, and in wanton and conscious disregard of Plaintiffs' rights. Accordingly, punitive damages should be assessed against each Defendant in an amount that will be sufficient to deter them from engaging in such conduct in the future.

## COUNT 4: UNJUST ENRICHMENT
## (AGAINT ALL DEFENDANTS)

94.    Paragraphs 1 through 68 are re-alleged as if fully set forth herein.

95.    Pandora franchisees, including Plaintiffs, are required to contribute a portion of monthly sales to a system marketing fund referred to in the Franchise Agreements and herein as the "Marketing Fund".

96.    In the Franchise Agreements, Pandora promised to make a "good faith effort to expend the Marketing Fund Fees in a manner that [they] determine is in the general best interests of the System." (Franchise Agrmt. § 9(C)i).

97.    Pandora further promised not to use the Marketing Fund for non-marketing purposes.

98.    Over the course of the parties' franchise relationship, Plaintiffs paid approximately $1,400,000 to the franchisor entity.

99.    Pandora failed to make a good faith effort to expend the Marketing Fund Fees to benefit the System and used the Marketing Fund for their own personal gain.

100.    Defendants' receipt of payments of fees without providing services

required of a legitimate franchisor has resulted in Defendants unjustly receiving, appreciating and retaining benefits from Plaintiffs, causing unjust enrichment of Defendants in an amount to be determined at trial.

## COUNT 5: UNFAIR COMPETITION
## (AGAINT ALL DEFENDANTS)

101.    Paragraphs 1 through 68 are re-alleged as if fully set forth herein.

102.    Each Defendant engaged in and is engaging in a series and pattern of unfair, unscrupulous, unethical, unlawful business practices.  This series and pattern includes purporting to terminate and/or terminating multiple franchises located in multiple locations without grounds to do so and in a manner that violates the covenant of good faith and fair dealing and Panama's Constitution Article 293.

103.    Each Defendant has been and is continuing to be and threatens to be unjustly enriched by its unfair, unscrupulous, unethical, unlawful conduct and should be required to disgorge and turn over to Plaintiffs all revenues and profits and value that they received, obtained and derived that arising from or is infected by their unfair business practices.

104.    Defendants should be enjoined and restrained on a temporary, preliminary and permanent basis; both prohibitory and mandatory in nature, to avoid and refrain from all forms of unfair competition including but not limited to purporting to terminate and/or terminating multiple franchises located in multiple locations without grounds to do so and in a manner that violates the covenant of good faith and fair dealing and Panama's Constitution Article 293, interfering with Plaintiffs business and contractual relations.

## COUNT 6: DECLARATORY JUDGEMENT
## (AGAINT DEFENDANTS PANDORA FRANCHSING LLC AND
## PANDORA LATAM LLC)

105.    Paragraphs 1 through 68 are re-alleged as if fully set forth herein.

106.    28 U.S.C. § 2201 confers upon the Court the power to determine

1    within its District the rights of the parties to a contract where an actual controversy

2    exists.  The parties need a judicial declaration to guide their future conduct.

3         107.    An actual controversy exists between Plaintiffs and Defendants.

4    Plaintiffs contend that the purported notices of default provided to Plaintiffs

5    pursuant to the Franchise Agreements was not proper notice and that the purported

6    notices of termination required pursuant to the Franchise Agreements was likewise

7    ineffective.  Defendants deny this.

8         108.    Plaintiffs request a declaratory judgment that notices of default

9    provided to Plaintiffs was not proper notice and that the purported notices of

10   termination required pursuant to the Franchise Agreements was likewise

11   ineffective. Plaintiffs further request a declaratory judgment that the Franchise

12   Agreements have not been terminated.

13        109.    A controversy exists between Plaintiffs and Defendants regarding the

14   interpretation of Section 19(C) of the Franchise Agreement.

15        110.    Plaintiffs contend that the novel Covid-19 Pandemic and the response

16   to the Pandemic of the Panamanian government which caused the opening of the

17   franchise location at Panama City Tocumen Airport Terminal 2 is defined as a

18   force majeure event under the Franchise Agreements.

19        111.    Plaintiffs request a declaratory judgment that the failure to open the

20   franchise location at Terminal 2 within 180 days after the effective date of the

21   Franchise Agreement for Terminal 2 does not trigger an event of default under the

22   Franchise Agreements.

23        112.    A further controversy exists between Plaintiffs and Defendants

24   regarding Section 9(C)i of the Franchise Agreement.

25        113.    Plaintiffs contend that Defendant must act in good faith when

26   expending the Marketing Fund Fee.  Defendants deny this.

27        114.    Plaintiffs request a declaratory judgment that Section 9(C)i requires

28   Defendants to exercise discretion in good faith in expending the Marketing Fund

1  Fee.

2  <u>**PRAYER FOR RELIEF**</u>

3  Plaintiffs pray for relief and judgment on the Complaint against Pandora

4  Franchising LLC and Pandora Latam LLC as follows:

5  1.     For damages according to proof in excess of $42,000,000.

6  2.     For temporary, preliminary and permanent injunctive relief,

7  mandatory and prohibitory in nature, enjoining all forms of unfair business acts

8  and practices and unfair competition, including but not limited to purporting to

9  terminate and/or terminating multiple franchises located in multiple locations

10 without grounds to do so and in a manner that violates the covenant of good faith

11 and fair dealing and Panama's Constitution Article 293, withholding services,

12 interfering with Plaintiffs business and contractual relations, and all other forms of

13 unfair competition and  practices.

14 3.     For disgorgement of unjust enrichment and restitution in amounts to

15 be proven at trial;

16 4.     For attorney's fees and costs pursuant to Section 13(C) of the

17 franchise agreements;

18 5.     For a declaratory judgment that the Franchise Agreements with

19 Pandora Latam LLC have not been terminated.

20 6.     For a declaratory judgment that the purported notices of default

21 provided to Plaintiffs was not proper notice and that the purported notices of

22 termination required pursuant to the Franchise Agreements was likewise

23 ineffective.

24 7.     For a declaratory judgment that the failure to open the franchise

25 location at Terminal 2 within 180 days after the effective date of the franchise

26 agreement is not a default of the franchise agreement.

27

28

8.      For a declaratory judgment that Section 9(C)i of the Franchise Agreement requires Defendants to exercise discretion in good faith when expending the Marketing Fund Fee.

9.      For punitive damages.

10.     For such other and further relief as the Court deems just and proper.

DATED: July18, 2022                          **GREENSPOON MARDER LLP**
                                             /s/ *Eric VandeLinde*
                                             Eric VandeLinde, Esq.
                                             *Attorneys for Plaintiffs*

## <u>JURY DEMAND</u>

Plaintiffs request trial by jury.

                                             **GREENSPOON MARDER LLP**

                                             /s/ *Eric VandeLinde*
                                             Eric VandeLinde
                                             *Attorneys for Plaintiffs*

COMPLAINT