
May 8, 2017

Rajesh Mohinani
Mohinani Group, S.A.
Calle 51 Bella Vista
Edificio Habitat Piso M
Panama City, Panama

**Re: #753 Oakland Mall, Guatemala City GT**
    PANDORA Franchise Agreement
    PANDORA Nondisclosure & Noncompetition Agreements

Dear Rajesh,

Enclosed are the fully executed PANDORA Franchise Agreement and PANDORA Nondisclosure and Noncompetition Agreements for PANDORA @ Oakland Mall.

Congratulations and best of luck with PANDORA @ Oakland Mall.

Kind regards,

Laurie Long
Real Estate & Franchise Coordinator
llong@pandora.net
410-309-0200

# PANDŌRA

Franchise Agreement (Guatemala) #753

## Oakland Mall

Authorized Location:

Diagonal 6, 13-01: Zona 10, Space 127-C

Guatemala City, GT 1010

©2017 Pandora Franchising, LLC
All Rights Reserved.

## TABLE OF CONTENTS

## PANDORA FRANCHISE AGREEMENT

| SECTION | | PAGE |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | GRANT OF LICENSE | 2 |
| 3. | TRADEMARK STANDARDS AND REQUIREMENTS | 4 |
| 4. | TERM AND OPTION FOR NEW AGREEMENT | 6 |
| 5. | PRE-OPENING OBLIGATIONS | 7 |
| 6. | STORE STANDARDS AND MAINTENANCE | 8 |
| 7. | PRODUCTS AND OPERATIONS STANDARDS AND REQUIREMENTS | 10 |
| 8. | PERSONNEL AND SUPERVISION STANDARDS | 16 |
| 9. | MARKETING | 17 |
| 10. | FINANCIAL REPORTING | 19 |
| 11. | YOUR OTHER OBLIGATIONS; NON-COMPETE COVENANTS | 20 |
| 12. | TRANSFERS | 23 |
| 13. | DISPUTE RESOLUTION | 27 |
| 14. | LIMITATION OF LIABILITY | 28 |
| 15. | DEFAULT AND TERMINATION | 30 |
| 16. | POST-TERM OBLIGATIONS | 33 |
| 17. | GENERAL PROVISIONS | 35 |

## APPENDICES

A.    Personal Guarantee
B.    Acknowledgement Addendum
C.    Lease Provisions
D    Nondisclosure and Noncompetition Agreement

PANDORA®
FRANCHISE AGREEMENT

This Franchise Agreement ("**Agreement**") is entered into and effective as of this 8th day of MAY, 2017 (the "Effective Date") between Pandora Franchising, LLC, a Maryland limited liability company ("**we**" or "**us**"), and MA Group, S.A., a Guatemalan corporaton ("**you**"). If you are a corporation, partnership, limited liability company or other legal entity, certain provisions to this Agreement also apply to your owners as individuals.

## BACKGROUND

A.     We and our affiliates have invested considerable resources in the development, design, manufacture and marketing of a unique line of jewelry and a patented method for designing custom jewelry under the PANDORA mark and have developed a unique system for operating retail stores that feature PANDORA merchandise.

B.     You desire to develop and operate a PANDORA Store.

In consideration of the foregoing and the mutual covenants and consideration below, you and we agree as follows:

## 1.     DEFINITIONS

For purposes of this Agreement, the terms below have the following definitions:

A.     "**Gross Sales**" includes all revenues and income from any source derived or received by you from, through, by or on account of the operation of your Store whether received in cash, in services, in kind, from barter and/or exchange, on credit whether or not payment is actually received) or otherwise. Gross Sales does not include sales taxes collected from customers and remitted to taxing authorities or documented customer refunds given by you in good faith.

B.     "**Internet**" means any of one or more local or global interactive communications media, that is now available, or that may become available, and includes web sites, domain names and social media applications or platforms and other interactive media platforms. Unless the context otherwise indicates, Internet also includes methods of accessing limited access electronic networks, such as Intranets, Extranets, and WANs.

C.     "**Intellectual Property**" means the trademarks, trade dress and all other intellectual property owned by us or our affiliate and licensed by us to you.

D.     "**Intellectual Property Rights**" means (a) the Trade Marks and Trade Names as well as any rights in inventions, patents, copyrights, confidential information, database rights, promotional material, know-how, domain names, designs, whether registered or unregistered, and any rights similar to the foregoing in any part of the world; (b) any application and/or the right to apply for registration for any of the same, and (c) any other intellectual property rights (whether registered or not) related to or subsisting in the Products and/or related to the System, including any and all designs, color schemes and usages for the operation of the Store.

1

Pandora – 2017 FA v2

E.    "**Manual**" means our confidential: (i) retail management guide; (ii) any additional manual or manuals, (iii) any Intranet, Extranet, or password protected portion of an Internet site, and (iv) any amendments, supplements, derivative works, and replacements, whether embodied in electronic or other media which contain required guidelines.

F.    "**Marks**" mean the PANDORA Mark that has been registered with the U.S. Patent and Trademark Office and other registered and unregistered trademarks, service marks, trade names and commercial symbols that we adopt, modify and change from time to time. Marks also mean the trade dress, which includes the designs, color schemes and image we authorize you to use in the operation of the Store from time to time.

G.    "**Products**" mean the line of jewelry described in the Patent "Bracelets and Necklaces with Keepers," (Pat. No. 7,007,507) that permits the user to add or remove interchangeable beads of different designs, materials and configurations to create custom jewelry for different occasions as well as all other jewelry, jewelry components, watches, sunglasses and other items that we authorize you to sell in your Store. The Products include all the components of such jewelry including an extensive assortment of beads along with spacers and bands used to maintain the desired space between beads.

H.    "**Store**" means the PANDORA Store you develop, maintain and operate pursuant to this Agreement.

I.    "**Store Manager**" means the individual who (i) personally invests his or her full time and attention and devotes his or her best efforts to the on-premises general management of the day-to-day operations of the PANDORA Store, (ii) meets our retail management experience requirements, and (iii) does not participate in the active operation or management of any business other than the Store.

J.    "**System**" means the PANDORA Jewelry System  a comprehensive retail system for the sale of the Products emphasizing a prompt, courteous and knowledgeable service in a luxury goods atmosphere.

K.    "**Transfer**" means to voluntarily or involuntarily transfer, assign, sell, or encumber any direct or indirect interest in the ownership of the franchisee entity (if the franchisee is a corporation, partnership, or limited liability company) , or any interest in the substantial assets of the Storeor this Agreement.

2.    GRANT OF LICENSE

The following provisions control with respect to the license granted under this Agreement:

A.    Authorized Location.  We grant to you the right and license to establish and operate a retail Store identified by the PANDORA Mark or such other marks as we may direct, to be located at Oakland Mall, Guatemala City, Guatemala, space 127-C, or a location to be designated (the "**Authorized Location**"). When a location has been designated and approved by you and us, it will become part of this Section 2.A as if originally stated. You accept the license and undertake the obligation to operate the Store at the Authorized Location using the Marks and the System in compliance with the terms and conditions of this Agreement.

2

B.    Opening.  You agree that the Store will be open and operating in accordance with the requirements of Section 6.A within 180 days from the effective Date unless we authorize in writing an extension of time.  If the Store is not open or operating within 180 days from the Effective Date, we have the right to terminate this Agreement immediately upon written notice to you.

C.    Nonexclusivity; Our Reservation of Rights.

i.    The license is limited to the right to develop and operate one Store at the Authorized Location.  We agree that during the term of this Agreement we will not operate or license anyone else the right to operate a Pandora store within the mall or shopping center in which your Store is located ("**Mall**"), except as noted below.  As used in this Agreement, "Mall" includes both urban shopping areas featuring a variety of shops with an open-air concourse reserved for pedestrian traffic, as well as a large suburban building or buildings containing various shops and associated passageways.  The license does not provide you with (a) any right to sell Pandora Jewelry merchandise or other approved products at any location other than the Authorized Location, (b) any right to sell Pandora Jewelry merchandise on the Internet, (c) any right to sell products to any person or entity for resale or further distribution, or (d) any right to exclude, control or impose conditions on our development of future franchised, company or affiliate owned stores at any time or at any location outside the Mall.

ii.    You further acknowledge and agree that we and our affiliates have the right to (a) grant other franchises or develop and operate company or affiliate-owned PANDORA Stores at any location anywhere outside of the Mall, (b) distribute some or all of the Products through department stores and other retailers, including jewelry stores, within the Mall regardless of proximity of the department store(s) and other retailer(s) to your PANDORA Store, and (c) sell any products or services anywhere, whether or not using the Marks, through alternative channels of distribution (including Internet and mail order). The Internet is a channel of distribution reserved exclusively to us, and you may not independently market your PANDORA Store or your inventory on the Internet or otherwise conduct e-commerce except as we approve.  We also reserve the right to purchase or be purchased by, or merge or combine with, competing businesses wherever located as further described in Section 12.A of this Agreement.

D.    Modifications.  You recognize that variations and additions to the System may be required from time to time in order to preserve or enhance the System.  Therefore, we expressly reserve the right to add to, subtract from, revise, modify or change from time to time the System or any part thereof, and you agree to promptly accept and comply with any such addition, subtraction, revision, modification or change and to make such expenditures as may be necessary to comply.

E.    Omni-Channel Solution.

3

We may introduce from time to time one or more omni-channel solutions for the purpose of improving the customer experience, expanding the shopping universe, optimizing consumers' option to shop in and across channels, or other reasons that we determine in our sole discretion. You must participate in any such solution introduced by us, which may include but is not limited to the following features and obligations:

*(i) Customer data*: participate in and use its best efforts to collect customer data and insights in one database which we, our parents or our affiliates may own; and

*(ii) Flexible shopping options*: participate in all flexible shopping options, for example, fulfilling online orders for Products in the Store, or accepting returns of Product ordered on-line in the Store; and

*(iii) Insights*: Purchase and implement technologies in the Store to optimize traffic and sales and customize sales and customer service.

F.    <u>Products</u>.  While you will be able to purchase a wide variety of Products from us or our affiliates, you acknowledge and agree that you do not have the right to purchase all types and models of PANDORA jewelry and other products.  We reserve the right to manufacture and sell certain items of jewelry and related products, or new product lines, to non-franchised PANDORA customers without making them available to franchisees.  You will be entitled to purchase all PANDORA jewelry and related products that are generally available to other PANDORA franchised stores in the United States except in the case of product shortages.

## 3.    TRADEMARK STANDARDS AND REQUIREMENTS

You acknowledge and agree that the Marks are our property or the property of our affiliates and you may only use the Marks with our written consent.  You further acknowledge that your right to use the Marks is specifically conditioned upon the following:

A.    <u>Ownership</u>.  We or our affiliates are the owner of all right, title and interest in and to the Marks and all past, present or future goodwill of the Store and of the business conducted at the Authorized Location that is associated with or attributable to the Marks.  Your use of the Marks will inure to our or our affiliate's benefit.  You may not, during or after the term of this Agreement, engage in any conduct directly or indirectly that would infringe upon, harm or contest our or our affiliate's rights in any of the Marks or the goodwill associated with the Marks, including any use of the Marks in a derogatory, negative, or other inappropriate manner in any media, including but not limited to, print or electronic media.  Further, you may not apply to register or use any marks that are the same as or confusingly similar to the Marks.   You shall not represent that you have any ownership in or title to the Marks, or the registration thereof.  You acknowledge that neither this Agreement nor your use of the Marks creates any right, title or interest in or to the Marks in your favor.

B.    <u>Use</u>.  You may not use, or permit the use of, any trademarks, trade names service marks or logos in connection with the Store except those we direct in writing.  You may use the Marks only in connection with such products and services as we specify and only in the form and manner we prescribe in writing.  You must comply with all trademark, trade name and service mark notice marking requirements.  You may use the Marks only in association with products and services approved by us and that meet our standards with respect to quality, condition, display and

4

packaging. You may not engage in any conduct which could impair the goodwill associated with the Marks.

C.    Store Identification.  You must use the name PANDORA as the Store nameand you may not use any other mark or words to identify the Store.  You may not use the word PANDORA or any of the other Marks as part of the name of your corporation, partnership, limited liability company or other similar entity or in combination with any other mark, trade name or distinctive sign ; provided, however, that you may use the name PANDORA as an assumed or fictitious name duly registered in accordance with the laws applicable in the state in which the Store is located. You may use the Marks on various materials, such as business cards, stationery and checks, provided you (i) accurately depict the Marks on the materials as we describe, (ii) include a statement on the materials indicating that the business is independently owned and operated by you, (iii) do not use the Marks in connection with any other trademarks, trade names or service mark, or logos unless we specifically approve in writing prior to such use, and (iv) make available to us, upon our request, a copy of any materials depicting the Marks.  You must post prominent signs in the Store identifying you as a PANDORA franchisee in a format we deem reasonably acceptable, including an acknowledgment that you independently own and operate the Store, including one sign that is directed to your customers and another sign that is directed to your employees All your business cards and internal and external signs must comply at all times with our guidelines, requirements and practices, as they are modified from time to time.

D.    Litigation.    We have the sole right to decide whether, and in what manner, to institute legal proceedings against any infringers of our Intellectual Property Right.  In the event any person or entity improperly uses or infringes the Marks or challenges your use or the ownership of the Marks, we will control all litigation and we have the right to determine whether suit will be instituted, prosecuted or settled, the terms of settlement and whether any other action will be taken. You must promptly notify us of any such use or infringement of which you are aware or any challenge or claim arising out of your use of any Mark.  You must take reasonable steps, without compensation, to assist us with any action we undertake.  We will be responsible for our fees and expenses with any such action, unless the challenge or claim results from your misuse of the Marks in violation of this Agreement, in which case you must pay us for our fees, costs and expenses. You may not take any immediate interim out-of-court action, such as the submission of warning letters, against any such infringers, except with our prior written consent.  You shall not have any right to receive all or any part of any damages recovered by us as a result of any action taken in relation to such infringement.

E.    Changes.  You may not make any changes or substitutions to the Marks unless we direct in writing.  We reserve the right to change the Marks at any time.  Upon receipt of our notice to change the Marks, you must cease using the former Marks and commence using the changed Marks, at your expense.

F.    Our Obligations in the Event of Infringement.  In the event that it is established by a court that the use of any of the Marks violates a third party's rights and as a result you are denied use of the Marks by or on behalf of the entitled party, we shall at our own discretion and choice, either:

    i.    obtain the rights for you to continue to use Marks;

5

ii.     revise the Marks so that they do not infringe; or

iii.    terminate your license or right to use the relevant Marks.

G.     <u>Improvements</u>.  In the event you make any improvements to the Marks, the System and/or create anything under or relating to this Agreement that is or may protected by intellectual property laws, you hereby in advance assign any intellectual property rights you may have in or to such improvement or creation (as well as where applicable priority rights pertaining thereto) to us, which assignment we hereby accept. Any goodwill associated with or arising from the use of the intellectual property rights you own or create will be for our benefit.

H.     <u>Further Assurances</u>.  Upon our request, you agree to execute and deliver such documents, provide such information or take such other actions as we may request in connection with the sales and marketing of Products or to otherwise effectively carry out the requirements of this Agreement.

## 4.    TERM AND OPTION FOR NEW AGREEMENT

The following provisions control with respect to the term of this Agreement:

A.     <u>Term</u>.  The initial term is for a period of ten (10) years and commences on the date that your PANDORA Store opens for business.

B.     <u>Right to Successor Franchise</u>.  Upon the expiration of the initial term of this Agreement, you shall have the option to acquire a successor franchise for your Store upon the following terms and conditions:

i.     We are offering franchises in the geographic area in which your Store is located at the time you give us notice of your desire to exercise the option to acquire a successor franchise.

ii.    You have a valid lease, or are able to renew or extend your lease for the Authorized Location, for the entire duration of the term of the successor franchise agreement.

iii.   You provide us with written notice not less than six months nor more than twelve months before the expiration of the Term of this Agreement that you desire to obtain a successor franchise.

iv.   You, or any entity under common control with you, are not then in breach of the terms and conditions of this Agreement or any other Agreement with us and you shall have substantially observed and performed the terms and conditions of this Agreement or any other Agreement with us throughout the term. For purposes of this section, "entity under common control" means a store operated by an entity that has as an owner, member or partner, any individual or entity which is also an owner, member, or partner of you.

6

v.      You must, at your expense, bring the Store up to the then-current standards for a PANDORA business and comply with any applicable updating or remodeling requirements required by us. There is no limitation on the amount we may require you to spend on refurbishing, remodeling and replacement.

vi.      You agree to complete any additional training we may require. There may be a fee for training and you will be responsible for travel and lodging expenses for you and others in your organization who attend the training.

vii.      You must sign our then-current form of Franchise Agreement. You will not be required to pay any initial fee then being charged and we will not be required to provide any of the initial training or other services contained in such Agreement which we provide to a new franchisee. The term of the new Franchise Agreement may have a shorter term than this Franchise Agreement.

viii.      You and your owners must sign a general release in a form we prescribe, to the fullest extent permitted by law, to release us and our officers and employees from any claims you may have against us.

ix.      You must pay our then-current renewal fee, not to exceed $5,000.

## 5.      PRE-OPENING OBLIGATIONS

Prior to opening the Store, you must comply with all pre-opening obligations which we require, including without limitation the following:

A.      register for all applicable taxes, including without limitation sales tax, and payroll taxes;

B.      read and understand the Manual and acknowledge receipt in writing to the us that you have read and understand the Manual;

C.      ensure that you have complied with all provisions of this Agreement relating to the lease for your Store;

D.      purchase the start-up Product package from us or our affiliate;

E.      build-out the Store in accordance with a layout and design provided by us or from a party we designate in accordance with the provisions of this Agreement;

F.      purchase and install in the Store fixtures, display cabinets and materials from a third party we designate;

G.      obtain from us or from a third party we designate point of sale materials sufficient for the first month of operations;

H.      complete the training indicated as required in the Manual; and

7

I.   undertake such initial advertising and marketing for the store as required by this Agreement.

### 6.   STORE STANDARDS AND MAINTENANCE

You acknowledge and agree that we have the right to establish, from time to time, quality standards regarding the business operations of PANDORA Stores to protect the distinction, goodwill and uniformity symbolized by the Marks and the System. Accordingly, you agree to maintain and comply with our quality standards and agree to the following terms and conditions:

A.   Store Location; Lease.

i.   You are responsible for leasing a site that meets our site selection guidelines. We must accept the site in writing. You may not use the Store premises or Authorized Location for any purpose other than the operation of the Store during the term of this Agreement. We make no guarantees concerning the success of the Store located on any site which we accept.

ii.   You may not open your Store for business until we have notified you in writing that you have satisfied all your pre-opening obligations, including without limitation those set forth in Section 5 and we have approved your opening date. We are not responsible or liable for any of your pre-opening obligations, losses or expenses you might incur for your failure to comply with these obligations or your failure to open by a particular date.

iii.   If you plan to enter into any type of lease for the Store premises, you must provide the lease to us and receive our prior written approval of the lease before you execute it. We have no responsibility for the lease, and our approval of the lease is limited to confirming that its terms are sufficient to allow you to operate the Store. We do not engage in a legal review of your lease and strongly suggest you retain competent counsel to do so for you. It is your sole responsibility to evaluate, negotiate and enter into the lease for the Store premises. Your lease must contain provisions that: (i) allow us to elect to receive an assignment of your leasehold interest upon termination or expiration of this Agreement; (ii) require the lessor concurrently to provide us with written notice of any deficiency under the lease, and allow us the right (but not the obligation) to cure any deficiency under the lease; (iii) allow the lease to be sub-leased to us; and (iv) provide us with access to the premises following termination or expiration of the lease to remove all signs and other items identifying the premises as a PANDORA Store, as noted on the attached Appendix C. You must provide us a signed copy of the lease within five days of execution. We may require you to acknowledge, in writing, that your lease for the Store premises satisfies the requirements of this paragraph.

iv.   You may not sublease the lease to any third party without our prior written consent.

v.   You may not modify the lease without our express written consent.

8

B.     <u>Construction; Future Alteration</u>. You must construct and equip the Store in accordance with our approved specifications and standards pertaining to equipment, inventory, signage, fixtures, accessory features and design and layout. We reserve the right to specify the architect you must use to create your architectural plans. You must use our designated supplier to install all fixtures at the Store. We may require you to purchase fixtures, initial design, layout and interior elevation plans and other items for the Store from a designated supplier. You may be required to purchase these and other items from a single source, and that source may be us or our affiliates. You will pay the then-current price in effect for all purchases you make from us or our affiliates. You may not commence construction of the Store until you have received our written consent to your plans. You must resubmit to us and receive our written approval prior to making any changes to previously approved plans, including any replacement, reconstruction, addition or modification in the building, interior or exterior decor or image, equipment or signage of the Store. We reserve the right to charge you a fee to review your plans. Before we consent to the opening of the Store, you must provide us with copies of lien waivers from the contractors used to construct the Store premises. You are solely responsible for all the expenses, taxes and import duties arising from or relating to the purchase of accessories, fixtures, equipment and/or inventory imported to Guatemala for related to the Store.

C.     <u>Maintenance</u>. The equipment, fixtures, furnishings, signage, and trade dress, (including the interior and exterior appearance) in your Store must be maintained in accordance with our requirements established periodically and any of our reasonable schedules prepared based upon our periodic evaluations of the premises.

D.     <u>Modernization and Upgrading</u>.

    i.     Subject to the terms of this Section, you must at all times comply with our standards, specifications, processes, procedures, requirements and instructions regarding the Store's physical facilities, including Store, layout, furnishings, fixtures and signage. You must maintain the Store in good and safe condition, as specified in the Manual. You must remodel or upgrade the Store at your sole cost and expenses in accordance with our standards, which may be modified by us at any time. You must complete a major upgrade to bring your Store up to the then-current standards for a new Store around the time of the fifth anniversary of the opening of your Store, the exact timing to be designated by us, although we may require you (in our sole discretion) to refurbish the Store instead. The standards for completing the major upgrade will be the standards then in effect. You acknowledge that the costs and expenses of such remodeling or upgrading, and for completing the major upgrade, are not capped or limited in any way.

    ii.     Each and every transfer of any interest in this Agreement or your business governed by Section 12 or any successor term covered by Section 4.B is expressly conditioned upon your compliance with these modernization or replacement requirements at the time of transfer or renewal.

    iii.     You acknowledge and agree that the requirements of this Section 6.D are both reasonable and necessary to ensure continued public acceptance and patronage of PANDORA Stores and to avoid deterioration or obsolescence in connection with the operation of the Store. If you fail to make any improvement as required by this Section or

9

perform the maintenance described in Section 6.C, we may, in addition to our other rights in this Agreement, effect such improvement or maintenance and you must reimburse us for the costs we incur.

E.     Relocation.  You may not relocate the Store without our prior written consent.  In the event that we permit you to change the location of your PANDORA Store at any time during the term of this Agreement or any extensions or renewals thereof, you shall conform such Store site to the then-current layout and specifications for new PANDORA Stores as we may specify in writing, and you will be solely responsible for all costs and expenses incurred therewith.

F.     Signage.  The signage at your Store must comply with our specifications, which we may modify and change from time to time due to modifications to the System, including changes to the Marks.

### 7.     PRODUCTS AND OPERATIONS STANDARDS AND REQUIREMENTS

You must implement and abide by our requirements and recommendations directed to enhancing substantial System uniformity.  The following provisions control with respect to products and operations:

A.     Sale of Products to End Consumers.  You may only sell the Products at the Store, or, if authorized by us in writing, online using only those urls which we approve or designate.  In no event may you sell Products to anyone other than end user customers, including without limitation (i) any third party online auction sites (for example, eBay); (ii) any third party online retail sites (for example, Amazon); or (iii) any other retailers, whether or not the retailer is an authorized PANDORA retailer or another franchisee.  In no instance are you authorized to sell any merchandise or service not specifically authorized by us in writing.  You must comply with the inventory selection and stocking standards contained in the Manual or as we may otherwise designate, and you must offer for sale all Products designated by us.  We have the right to make modifications to inventory selection and stocking standards from time to time, and you agree to comply with any such modifications.  In regard to the sale of Products, you must comply with the terms and conditions of the warranty and after-sales service for the Products as we establish from time to time and you must further comply with policies and instructions we provide in relation to the treatment of Products returned to you by consumers.

B.     Product Purchases From Us.  We or our affiliate will sell to you jewelry, jewelry components, packaging, display, promotional material, and marketing materials to be sold or used in the Store.  You must purchase all Products only from us, our affiliates or suppliers designated or approved by us.  You may not purchase any other products, merchandise or accessories meant for the sale or use in the Store from any other sources except with our prior approval.  You will pay the then-current price in effect at the time for Products you purchase from us or our affiliates.  We reserve the right to change our prices on a prospective basis from time to time.  We have the right to make a profit from the sale of products to you.  We will endeavor to use commercially reasonable efforts to have available for your purchase from us a reasonable amount of Product offerings in stock.  We have the right to apportion Products and any other items due to shortages.  The return of Products purchased by you from us will be subject to our warranty and returns policies as we establish from time to time.  You are solely responsible for the payment of all taxes,

10

fees, duties, obligations and similar payments arising from the importation of Products into Guatemala.

C.  Approved Supplies and Vendors.

i.  You must use approved supplies and services in the Store as set forth in the Manual, which we may amend from time to time. You acknowledge and agree that certain approved supplies and services may only be available from one source, and we or our affiliates may be that source. You will pay the then-current price in effect for all purchases you make from us or our affiliates. Any materials,other items,supplies, and services used in the operation of the Store that are not included in the approved supplies,suppliers, services or service providerslist must conform to the specifications and standards we establish from time to time.  ALTHOUGH APPROVED BY US, WE AND OUR AFFILIATES AND EXPRESSLY DISCLAIM ALL WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, WITH RESPECT TO PRODUCTS, EQUIPMENT (INCLUDING WITHOUT LIMITATION ANY REQUIRED COMPUTER SYSTEMS), SUPPLIES, FIXTURES, FURNISHINGS, DESIGN PLANS, SERVICES OF ANY TYPE, OR OTHER APPROVED ITEMS.  IN ADDITION, WE DISCLAIM ANY LIABILITY ARISING OUT OF OR IN CONNECTION WITH THE SERVICES RENDERED OR PRODUCTS FURNISHED BY ANY SUPPLIER APPROVED OR DESIGNATED BY US.  OUR APPROVAL OR CONSENT TO ANY SERVICES, GOODS, SUPPLIERS, OR ANY OTHER INDIVIDUAL, ENTITY OR ANY ITEM SHALL NOT CREATE ANY LIABILITY TO US.

ii.  Our determination of approved suppliers,brands,supplies or suppliers will be based on a variety of criteria which determine appropriate in our sole discretion. Except for items which are single sourced, we will consider written requests for changes or additions to our approved suppliers, products, service providers or servicesin a timely manner.  We will respond to any requests to change approved suppliers,  or service providers within a reasonable period of time, as long as we have the opportunity to fully evaluate such approved suppliers or service providers.  If we withdraw approval of any supplier or service provider, you must stop purchasing supplies or services from such supplier or service provider.  We reserve the right to receive rebates or other consideration based on your purchases And we further reserve the right to charge you a fee for consideration of suggested suppliers or service providers.

D.  Computer and Point of Sale System.  You must purchase and use the computer andpoint of sale systems that we develop or select for the Store, including all future updates, supplements and modifications (the "**Computer System**").  The Computer System may include all hardware and software used in the operation of the Store, including electronic point-of-sale cash registers and back office programs used to record, analyze and report sales, labor, inventory and tax information.  The software which must be used as part of the Computer System may include proprietary software which you may be required to license from us, an affiliate or a third party and you may be required to pay a software licensing or user fee in connection with your use of the proprietary software.  All right, title and interest in the software will remain with the licensor of the software.  The computer hardware component of the Computer System must conform to

11

specifications we develop. We reserve the right to designate a single source from whom you must purchase the Computer System, and we or an affiliate may be that source. You acknowledge and agree that we will have full and complete access to information and data entered and produced by the Computer System. You must have at the Authorized Location Internet access with a form of high speed connection as we require, and you must maintain an email account for the Store. You agree that in connection with any credit, debit and/or charge card payments you receive, you will adhere to, and cause any service provider or third party-provided payment applications to adhere to cardholder data security standards according to the then-current PCI (Payment Card Industry) Data Security Standards. You will be responsible for any costs and expenses related to compliance with such standards and/or related audits. You must provide us with evidence of such compliance at our request. You also must provide notice to us of any potential or actual data security breach relating to cardholder data. Only the third party providers of hardware and software shall be responsible for any failures of the hardware or software product they provide and we shall have no responsibility for such failures. You agree to enter data into your point of sale system promptly and accurately.

E.     Evaluations. We and our authorized representative have the right to enter your Store at all reasonable times during the business day for the purpose of making periodic evaluations and to ascertain if the provisions of this Agreement are being observed by you, to inspect and evaluate your premises, to inspect and evaluate your merchandise, supplies, and products, as well as the conditions of cleanliness and customer service; to determine compliance with the Excellence in Operations Scorecard ("**EIO Scorecard**"). In addition, we have the right to enter your Store at times other than your standard operating hours to determine compliance with the inventory requirements we may establish from time to time. Further, if we determine that any condition in the Store presents a threat to customers or public health or safety, we may take whatever measures we deem necessary, including requiring you to immediately close the Store until the situation is remedied to our satisfaction. Our inspections and evaluations may include a "mystery shopper" or customer satisfaction program from time to time. If you fail an EIO Scorecard or other evaluation by us, or if a mystery shopper or other customer satisfaction program yields unacceptable results as determined by us in our discretion, or if we receive a specific customer complaint, you must pay the costs and expenses of follow-up investigations, mystery shopper visits, or customer satisfaction programs, as applicable.

F.     Data Ownership, Protection, Privacy and Security.

(i)     You acknowledge and agree that we own all business records ("**Business Records**") with respect to your customers including, without limitation, names, addresses, telephone numbers, e-mail addresses, customer purchase records, and all other customer records contained created and maintained by you. You further acknowledge and agree that, at all times during the term of this Agreement and after the termination, expiration or cancellation of this Agreement, we may access such Business Records, and may utilize, transfer, or analyze such Business Records as we determine appropriate in our sole discretion.

(ii)     You shall, at all times, comply with all applicable laws and legislation relating to protection of personal data, including without limitation, making accurate disclosures regarding the collection, use and dissemination of personal information, and

12

obtaining consent for the use and disclosure of personal information. You shall obtain all consents required to share personal data with us.

(iii)     You shall at a minimum, comply with all physical, Payment Card Industry ("**PCI**"), consumer data and privacy, and all other security measures relating to the Store which we may prescribe from time to time.

G.     <u>Customer Surveys; Customer List</u>.  Upon our request, you must deliver (including electronic delivery) to customers evaluation forms as are periodically prescribed by us and must participate and/or request your customers to participate in any marketing surveys performed by or on our behalf.  Subject to applicable law, you must also maintain a current customer list containing for each and every customer, the customer's (i) name, (ii) address, (iii) telephone number, and (iv) 9-digit zip code, and supply a copy of this list to us on a quarterly basis.  You may not use the Customer List for any purpose other than the operation and promotion of your PANDORA store.

H.     <u>Period of Operation</u>.  Subject to any contrary requirements of local law, your Store must be opened to the public and operated during the days and hours we designate, unless otherwise provided in your lease.

I.     <u>Operating Procedures; Manual; Periodic Revisions</u>.

i.     You must adopt and use as your continuing operational routine the required standards, procedures, techniques and management systems described in our Manual and other written materials.  Any required standards exist to protect our interests in the System and the Marks and not for the purpose of establishing any control or duty to take control over those matters that are reserved to you.

ii.     During the term of this Agreement, we will loan one (1) or more copies to you or provide you with password protected electronic access to the Manual.  The Manual is our sole property.  You must at all times treat the Manual, and the information it contains, as secret and confidential, and must use all reasonable efforts to maintain such information as secret and confidential.  We have the right at any time to revise the contents of the Manual and will provide you with notification of the updated material.  You expressly agree to comply with each new or changed requirement.  You acknowledge and agree that in the future the Manual and other system communications may only be available on the Internet or other online or computer communications.

iii.     You agree to comply with each new or changed provision beginning on the 10th day (or such longer time as specified by us) after receiving written notice from us.  Revisions to the Manual will be based on what we, in our sole determination, deem is in the best interests of the System, including to promote quality, enhance good will, increase efficiency, decrease administrative burdens, or improve profitability of us or our franchisees.  You acknowledge that because complete and detailed uniformity under many varying conditions may not be possible or practical, we specifically reserve the right and privilege, in our sole determination and as we may deem in the best interests of all concerned in any specific instance, to vary standards for any franchisee based upon the peculiarities of the particular site or circumstances, landlord requirements, business

13

potential, population of trade area, existing business practices, or any condition which we deem to be of importance to the successful operation of such franchisee's Store. You will not be entitled to require us to grant you a like or similar variation under this Agreement. You must at all times ensure that your copy of the Manual contains all updates received by you from us. In the event of any dispute as to the contents of the Manual, the terms contained in the master copy of the Manual maintained by us at our home office shall be controlling.

J.     Confidential Information. You, your Owners, and the Store Manager may not, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any other person or entity any Confidential Information, except to such employees who must have access to it in order to operate the Store. For purposes of this Agreement, "Confidential Information" means proprietary information contained in the Manual or otherwise communicated to you by us or our affiliates in writing, verbally, or through the Internet or other online or computer communications, and any other knowledge or know-how concerning the methods of operation and marketing of the Store. . "Confidential Information" shall not include

(i)     information obtained by that is or becomes published or is otherwise generally available to the public, other than as a consequence of your (or your employees' or agents') willful or negligent act or omission obtaining such information, or any of your employees or agents;

(ii)     information that is, at the time of disclosure, already lawfully in your possession and not already subject to any obligations of confidentiality; or

(iii)     information lawfully obtained from a third party who has itself lawfully obtained such information and is not subject to any confidentiality obligations in respect of that information

Any and all Confidential Information, including, without limitation, pricing policies, specifications, processes, materials, techniques and other data, may not be used for any purpose other than operating the Store. We may require that you obtain nondisclosure and confidentiality agreements in a form satisfactory to us from any persons owning any interest in the franchisee, the Store Manager and all employees and volunteers. You must provide executed copies of these agreements to us upon our request. You shall immediately notify us of all facts and information that comes to your attention and that indicates that Confidential Information is, is likely to be or has been disclosed other than as permitted by this Agreement.

K.     Communications with Third Parties Regarding Your Results. From time to time, third parties may attempt to obtain your operational or financial results for the purposes of trading in the shares of our Affiliate. You may not disclose any of your Store's qualitative or quantitative operating results to any such third party. Any requests for information from any third party individual or entity which analyzes the stock price of any Pandora entity must be referred to our Public Relations Department.

L.     Compliance with Law; Licenses and Permits. You must at all times maintain your premises and conduct your Store operations in compliance with all applicable laws, regulations, codes and ordinances, including but not limited to the following:. .

14

(i)     Anti-Money Laundering Laws.  You must at all times comply with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001.  You further agree to provide us with information and documentation that we require for purposes of compliance with anti-money laundering laws and to allow us to make and retain copies of such information.

(ii)    Anti-Corruption Laws.  You must at all times comply with all applicable anti-corruption laws and regulations, including without limitation the Foreign Corrupt Practices Act.  You represent and warrant that neither you, nor any person acting on your behalf will t pay, offer, or promise to pay, or authorize the payment of anything of value, either directly or indirectly, to any official or employee of any governmental authority or instrumentality, or of a public international organization, or of any agency or subdivision thereof, or to any political party or official thereof, or to any candidate or appointee for political office for the purpose of:  (i) influencing any act or decision of that person in their official capacity, including a decision to do or omit to do any act in furtherance of their official function with such governmental agency or instrumentality, public international organization, or political party; (ii) inducing such person to use their influence with such governmental agency or instrumentality or such public international organization or such political party to affect or influence any act or decision thereof; or (iii) securing any improper advantage.

You must secure and maintain in force all required licenses, permits and certificates relating to your Store.  You acknowledge that you are an independent business and responsible for control and management of your Store, including, but not limited to, the hiring and discharging of your employees and setting and paying wages and benefits of your employees.  You acknowledge that we have no power, responsibility or liability in respect to the hiring, discharging, setting and paying of wages or related matters.  You must immediately notify us in writing of any claim, litigation or proceeding that arises from or affects the operation or financial condition of your PANDORA Store, including any notices of code violations.

M.      Participation in Internet Web Sites or Other Online Communications.  You must have Internet access and an email account.  We may require you, at your expense, to participate in our PANDORA web site on the Internet, our intranet or extranet system or other online communications as we may require.  We have the right to determine the content and use of our web site and intranet or extranet system and will establish the rules under which franchisees may or must participate.  You may not separately register any domain name containing any of the Marks, operate any website in connection with the Store or reference the Marks or the Store on or in connection with any current or future social media network or platform.  We will identify the Store on our web site.  We retain all rights relating to our web site and intranet system and may alter or terminate our web site, extranet system or intranet system.  Your general conduct on our web site and intranet or extranet system or other online communications including the use of any social media platforms and specifically your use of the Marks or any advertising is subject to the provisions of this Agreement and policies that we promulgate from time to time.  You acknowledge that certain information related to your participation in our web site, extranet system or intranet system may be considered Confidential Information, including access codes and identification codes. Your right to participate in our web site and intranet or extranet system, or otherwise use the Marks or System on the Internet or other online communications, will terminate when this

15

Agreement expires or terminates. You may only use and download onto your computer software which has been designated or authorized by us in writing. You will be liable for any damage or problems caused by your use or downloading unauthorized software (including damage caused to our internet or intranet or other system) in addition to the other remedies contained in this Agreement.

N. <u>Promotions; Pricing</u>. You must participate in all advertising and promotional campaigns and programs designated by us. We may, from time to time, make suggestions to you with regard to your pricing policies. Any list or schedule of prices we furnish to you may, unless otherwise specifically stated, be treated as a recommendation only and failure to accept or implement any such suggestion will not in any way affect the relationship between you and us. Although you generally have the right to establish prices for the products and services you sell, we reserve the right to establish and enforce prices, both minimum and maximum, to the extent permitted by applicable law.

O. <u>System Modifications; Adaptations</u>. You acknowledge and agree that we have the right to modify, add to or rescind any requirement, standard or specification that we prescribe under this Agreement to adapt the System to changing conditions, competitive circumstances, business strategies, business practices, technological innovations, and other changes as we deem appropriate. You must comply with these modifications, additions or rescissions at your expense, subject to any express limitations set forth in this Agreement. You must inform us of any ideas for improvement or modification to of System or any product ideas which comes to your attention.

P. <u>Recalls</u>. Upon receipt of notice from us (by any means including email or telephone), you must co-operate with and assist us in connection with, and comply with our instructions in connection with, the recall or withdrawal from sale of any Products for any reason.

Q. <u>Notices Required by Us</u>. You must attach any notices that we require to stationery, products and packaging and you must conspicuously display any notices that we require.

8. <u>PERSONNEL AND SUPERVISION STANDARDS</u>

The following provisions and conditions control with respect to personnel, training and supervision:

A. <u>Supervision</u>. You must have a Store Manager at all times while the Store is operating. You or the Store Manager must ensure that the Store is operated in accordance with the terms and conditions of this Agreement and all applicable laws, including labor and employment laws. You remain liable for any failure on the part of your Store manager to properly operate the Store. The Store Manager must attend and successfully complete all required training.

B. <u>Training</u>. You must, at your expense, comply with all of the training requirements we prescribe for the Store to be developed under this Agreement. We reserve the right to require you to provide training that we specify instructing your employees that you, and not we, are the employer of your employees.

C. <u>Staffing</u>. You will employ a sufficient number of competent employees to ensure efficient service to your customers. You will also comply with our standards for dress and

appearance of Store employees. No employee of yours is deemed to be an employee of ours for any purpose whatsoever.

D. <u>Attendance at Meetings</u>. You must attend, at your expense, all annual franchise conventions we may hold or sponsor and all meetings relating to new operational procedures or programs, training, store management, sales or sales promotion, or similar topics.

## 9. MARKETING

You agree to actively promote your Store, to abide by all of our marketing requirements and to comply with the following provisions:

A. <u>Generally</u>. The image of the Pandora brand is of essential importance to us. You shall not engage in any form of marketing activities without our prior written approval. We will withhold our approval only in the event the marketing activities would be in any way detrimental to the Marks, the System and/or the image and reputation of us, our parents or our affiliates. The decision as to whether or not to grant approval in in our sole and absolute discretion

B. <u>Pre-Opening Marketing</u>. You must conduct certain advertising, marketing and public relations activities in connection with the opening of your Store, as we specify in writing. We require you to spend, in addition to the required local advertising contribution described below, between $10,000 and $25,000 for such market introduction advertising and related activities as more fully described in the Manual.

C. <u>On-Going Marketing</u>.

i. You must participate in all promotional and marketing activities required by us. You must maintain adequate supplies of advertising, marketing and promotional materials to meet the marketing and operational needs of the Store. From time to time, we will provide you with advertising and promotional materials for use by you in advertising, marketing and promotional activities. Likewise, we will from time to time provide you with materials related to new pro ducts, Valentine's Day, Christmas and any other promotions or events described in the Manual. Some of these materials and items are made available at no cost to you, except for applicable freight charges, which you will pay. You must purchase other of these materials from us. You may not use any other marketing or activity materials other than the latest updated materials provided by us without our prior written consent.

ii. If you want to use advertising and promotional materials that have not been provided by us, and have not yet been approved by us in writing, you must submit samples of all such advertising and promotional material to us for approval. We will approve or disapprove of any advertising and promotional material submitted by you within thirty days of receipt. If we do not approve such materials within 30 days, they will be deemed disapproved.

iii. You must fully participate in and support all such promotional campaigns, customer clubs, product or service clubs, prize contests, special offers, and other programs, national, regional, or local in nature (including the introduction of new services or

17

products), which we prescribe from time to time. You are responsible for the costs of such participation. In addition, you must honor any coupons, gift certificates or other authorized promotional offers of ours at your sole cost unless otherwise specified in writing by us. You may not create or implement your own customer loyalty program without our express written consent. It is your sole responsibility to obtain all necessary permits from competent authorities related to your participation in required marketing activities.

D. Co-op Reimbursement Eligible Advertising. Each year during the term hereof, we may designate, based on factors which we determine appropriate in our sole discretion, an amount of advertising expenses (your **"Co-op Eligibility Amount"**) which when spent by you, will entitle you to receive a merchandise credit equal to one-half of your Co-op Eligibility. Each year, you are required to spend your Co-op Eligibility Amount on advertising which meets the reimbursement requirements we establish. Your entitlement to reimbursement will be subject to rules and regulations we establish. All amounts spent towards your Co-op Eligibility Amount will count towards your local marketing requirement as set forth in Paragraph 9 D., above.

E. <u>Regional Advertising</u>. We may designate local or regional advertising coverage areas to develop cooperative local or regional advertising and promotional programs. You must participate in and contribute your share to the cooperative advertising and promotional programs in your advertising coverage area in addition to the contributions and expenditures required by this Agreement. Your contributions to cooperative advertising or promotional programs will be credited toward the minimum local advertising expenditures. Any such cooperatives will establish the procedures for contribution payments. You may be required to belong to and contribute a maximum of 100% of your local advertising contribution to any cooperative to which you are assigned. We may designate the coverage area, method and timing of payment, and any outside agencies; and may merge or dissolve cooperatives; and must approve bylaws and all activities and advertising; of any such cooperative. All cooperatives will report to us in the manner required by, and follow all requirements of, this Agreement.

F. <u>Marketing Fund</u>.

i. We have established a marketing fund (**"Marketing Fund"**) to which all similarly situated PANDORA stores must contribute in the amount and manner prescribed by us (**"Marketing Fund Fee"** or **"MFF"**), provided that the Marketing Fund Fee will not exceed 3% of monthly Gross Sales. Contributions to the Marketing Fund are in addition to your local and cooperative advertising expenditures.

ii. We will own and manage the Marketing Fund. The Marketing Fund is not a trust or escrow account, and we have no fiduciary obligation to franchisees with respect to the Marketing Fund; provided, however, that we will make a commercially reasonable effort to expend such fees in a manner that we determine is in the general best interests of the System. We have the right to determine the expenditures of the amounts collected and the methods of marketing, advertising, media employed and its contents, terms and conditions of marketing campaigns and promotional programs. Because of the methods used, we are not required to spend a prorated amount on each PANDORA Store or in each advertising market. We have the right to make disbursements from the Marketing Fund for expenses incurred in connection with the cost of formulating, developing and

18

implementing marketing, advertising and promotional campaigns. Disbursements from the Marketing Fund will be for advertising, public relations, market research, trade show attendance, promotion, point-of-sale materials, point-of-sale systems, and marketing of goods and services, payments to marketing agencies, and administration of the Marketing Fund, including but not limited to, salaries, overhead, administrative, accounting, collection and legal costs and expenses. The Marketing Fund fees collected by the Marketing Fund are non-refundable. We may terminate the Marketing Fund at any time in our sole determination. In the event that the Marketing Fund is terminated, any remaining balance in the Marketing Fund will be expended as provided for in this Section. The Marketing Fund may sponsor media that is local, regional, national or international in scope. The disbursements may include payments to us for the expense of administering the Marketing Fund, including accounting expenses and salaries and benefits paid to our employees engaged in the advertising functions. If requested, we will provide you an annual unaudited statement of the financial condition of the Marketing Fund.

G.   <u>Email Marketing. We reserve the right to require you to use a vendor whom we select for the creation and dissemination of marketing emails and emails of a commercial nature.</u>


## 10.   FINANCIAL REPORTING

A.   <u>Financial Reporting.</u>

(i)   You must record daily all sales in a format we designate. You must keep books and records and submit reports as we periodically require, including but not limited to a monthly profit plan, monthly balance sheet and monthly statement of profit and loss, records of prices, check registers, purchase records, invoices, sales summaries and inventories, sales tax records and returns, payroll records, cash disbursement journals and general ledger, all of which must accurately reflect the operations and condition of your Store operations. You must use the chart of accounts we designate. You must compile, keep and submit to us the books, records,reports using forms we prescribe, and using the methods of bookkeeping and accounting as we may periodically prescribe. The records that you are required to keep for your Store must include detailed daily sales, customer count, invoices and stock counts, broken down by SKU, number of units and value relating to the sale of Products in a form approved by us, including transaction level data (by way of example, UPT, ADS, and AUR); traffic data as well as CRM data (new and existing customers) and other relevant records or information maintained in an electronic media format and methodology we approve. All such records shall be full, accurate and up to date.. We may require you, at your cost, to have your records audited by us or by auditors designated by us. You must provide this information to us according to reporting formats, methodologies and time schedules that we establish from time to time. You also must preserve and retain the books, records and reports for at least 36 months from creation, or such longer time as required by law. You must allow us electronic and manual access to any and all records relating to your Store.

(ii) No later than two (2) months following the end of your fiscal year or another date agreed to by us in writing, you must provide us with copies of balance sheet and profit and loss statements relating to the Store for the prior fiscal year and no later than three (3) months following the end of your fiscal year or another date agreed to by us in writing, you must provide us with copies of tax returns for the prior fiscal year.

## 11. YOUR OTHER OBLIGATIONS; NON-COMPETE COVENANTS

You agree to comply with the following terms and conditions:

A.    Payment of Debts.  You are responsible for all expenses, costs and charges incurred by you in the operation of the Store.You agree to pay promptly when due: (i) all payments, obligations, assessments and taxes due and payable to us, affiliates, vendors, suppliers, lessors, federal, state or local governments, or creditors in connection with your business; (ii) all liens and encumbrances of every kind and character created or placed upon or against any of the property used in connection with the Store or business; and (iii) all accounts and other indebtedness of every kind incurred by you in the operation of the Store.  In the event you default in making any such payment, we are authorized, but not required, to pay the same on your behalf in which case we may at our option either (1) charge your credit card on file with us (if any) for payments we made on your behalf or (2) invoice you for payments made on your behalf and you agree promptly to reimburse us on demand for any such payment.

B.    Late Payments.  Interest Charges and Late Fees.  You must pay all amounts due to us without any deduction, set-off, credit, or counter-claim, unless approved by us in writing.  Any and all amounts that you owe to us will bear interest at the rate of 18% per annum or the maximum contract rate of interest permitted by governing law, whichever is less, from and after the date of accrual.  In addition to interest charges, you must pay to us a service charge of $50 for each delinquent report or payment that you owe to us under this Agreement.

C.    Compliance with All Laws and Ethical Business Practices.  You must operate your PANDORA Store in full compliance with all applicable laws, ordinances and regulations.  You must, in all dealings with your customers, suppliers and public officials, adhere to high standards of honesty, integrity, fair dealing and ethical conduct.  You must refrain from any practice which may injure the goodwill associated with the Marks.  You must notify us in writing within five days of the commencement of any action, suit, or proceeding, and of the issuance of any order, write, injunction, award, or decree of any court, agency, or other governmental instrumentality, which relates to, or which may affect the operation or financial condition of, you and/or your PANDORA Store.

D.    Indemnification.  You waive all claims against us for damages to property or injuries to persons arising out of the operation of your Store.  You must fully protect, indemnify, defend and hold us and our former and current owners, directors, officers, successors and assigns, harmless from and against any and all damages, losses, claims, demands, expenses and liabilities including attorneys' fees, costs, and expenses, and interest on such fees, costs, and expenses, of any nature whatsoever arising in any manner, directly or indirectly, out of or in connection with or incidental to the operation of your Store (regardless of cause or any concurrent or contributing

fault or negligence by us) including any claims related to actions or inactions by your employees and customers or any breach by you or your failure to comply with the terms and conditions of this Agreement. We also reserve the right to select our own legal counsel to represent our interests, and you must reimburse us for our costs and attorneys' fees, costs, and expenses, and interest on such fees, costs, and expenses immediately upon our request as they are incurred.

     E.    <u>Insurance</u>. You must purchase and maintain in full force and effect, at your expense:

     i.    Insurance policies, in such amounts and on such terms, as prescribed in the Manual, issued by an insurance company that we specify during the term of this Agreement and any interim period. Insurance coverage must include, but is not limited to, comprehensive general liability, combined single limit, automobile, bodily injury, Jeweler's Block insurance, business interruption, and all-risk property damage insurance and all other occurrences against claims of any person, employee, customer, agent or otherwise in an amount per occurrence of not less than such amount set forth in the Manual and adjusted by us periodically in our sole determination, unemployment and workers compensation insurance and any other additional insurance required by the terms of any lease or lender for the business. Insurance policies must insure you, us, our affiliates, and our and our affiliates' respective officers, directors, shareholders, managers, members and all other parties designated by us, as additional named insureds against any liability which may accrue against them because of the ownership, maintenance or operation by you of the PANDORA Store. The policies must also stipulate that we will receive a 30 day prior written notice of cancellation and must contain endorsements by the insurance companies waiving all rights of subrogation against us. Original or duplicate copies of all insurance policies, certificates of insurance, or other proof of insurance acceptable to us, including original endorsements effecting the coverage required by this Section, must be furnished to us together with proof of payment within 10 days of issuance. You must also furnish us with certificates and endorsements evidencing such insurance coverage within 10 days after each of the following events: (a) at all policy renewal periods, no less often than annually, and (b) at all instances of any change to, addition to, or replacement of any insurance. The certificates and endorsements for each insurance policy must be signed by a person authorized by that insurer to bind coverage on its behalf. All certificates and endorsements are subject to approval by us. We reserve the right to require complete, certified copies of all required insurance policies at any time. In the event you fail to obtain the required insurance and to keep the same in full force and effect, we may, but are not obligated to, purchase insurance on your behalf from an insurance carrier of our choice, and you will reimburse us for the full cost of such insurance, along with a reasonable service charge to compensate us for the time and effort expended to secure such insurance, within five days of the date we deliver an invoice detailing such costs and expenses to you. Notwithstanding the foregoing, your failure to obtain insurance constitutes a material breach of this Agreement entitling us to terminate this Agreement or exercise any or a combination of the other default remedies set forth in this Agreement. You must also procure and pay for all other insurance required by state or federal law. We reserve the right to modify minimum insurance requirements or the types of coverage required at any time by updating the Manual.

21

ii.      All public liability and property damage policies must contain a provision that we, although named as an additional insured, are nevertheless entitled to recover under such policies on any loss occasioned to us or our shareholders, members, directors, managers, employees or agents.

iii.      All liability insurance policies procured and maintained by you in connection with the PANDORA Store will require the insurance company we designate to provide and pay for attorneys to defend any legal actions, lawsuits or claims brought against you, us, our affiliates and their respective officers, directors, managers, members, agents, employees, and all other entities or individuals designated by us as additional insureds.

F.      Non-compete Covenants.  You agree that you will receive valuable training and Confidential Information that you otherwise would not receive or have access to but for the rights licensed to you under this Agreement.  You therefore agree to the following non-competition covenants:

i.      Unless otherwise specified, the term "you" as used in this Section 11.F includes, collectively and individually, all owners, guarantors, officers, directors, members, managers, and partners, as the case may be, and holders of any ownership interest in you.

ii.      You covenant that during the term of this Agreement you will not, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in any business that sells or offers to sell bracelets and charms that compete, directly or indirectly, with the PANDORA charm bracelet product line.

iii.      You covenant that you will not, directly or indirectly, solicit or otherwise attempt to induce, by combining or conspiring with, or attempting to do so, or in any other manner influence any person or entity with whom we conduct business to terminate or modify his, her, or its business relationship with us or to compete with us.

iv.      You covenant that you will not, for a period of one year after the expiration or termination of this Agreement, regardless of the cause of termination, or within one year of the sale of the Store or any interest in you, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in a business that sells or offers to sell bracelets and charms that compete, directly or indirectly, with the PANDORA charm bracelet product line:

(1)      At the premises of the former Store;

(2)      Within a 15-mile radius of the former Store; or

(3)      Within a 15-mile radius of the location of any other PANDORA Store, whether franchised or owned by us or our affiliates.

22

v.      You agree that the length of time in subpart (iv) will be tolled for any period during which you are in breach of the covenants or any other period during which we seek to enforce this Agreement. If any restriction in this Section 11.E is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, and/or length of time, but would be enforceable if modified, you and we agree that the covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law determines the covenant's validity. Specifically, if any part of these restrictions is found to be unreasonable in time or distance, each month of time or mile of distance may be deemed a separate unit so that the time or distance may be reduced by appropriate order of the court to that deemed reasonable.

vi.      You agree that you and your owners, guarantors, shareholders, members, partners, officers, and directors will execute our Nondisclosure and Noncompetition Agreement, the form of which is attached as Appendix D to this Agreement and incorporated by reference.

F.      <u>Personal Guarantee</u>. The following individuals are required to sign our Personal Guaranty, the form of which is attached as Appendix B to this Agreement: (i) each person who signs this Franchise Agreement; (ii) if you are an entity, each person who owns an interest in you (including without limitation owners, shareholders, members, and partners who own an interest in an entity which itself owns an interest in you); (iii) if you are an entity, +individuals who are officers and directors of you or of an entity which owns an interest in you; and (iv) anyone else that we may direct.

## 12.    <u>TRANSFERS</u>

You agree that the following provisions govern any transfer or proposed transfer:

A.      <u>Transfers by Us</u>. You acknowledge that our obligations under this Agreement are not personal, and we have the unconditional right to assign this Agreement to another entity, be acquired by another entity or merge with another entity We shall have the absolute right to transfer or assign this Agreement or any of our rights or obligation under this Agreement to any person or entity.

B.      We reserve the right to assign the System to anyone, including the operator of a competing national or regional chain or franchise system. You acknowledge and agree that we may sell our assets, the Marks or the System to any third party of our choice; may offer our securities privately or publicly; may merge with or acquire other business entities or be acquired by another business entity; may permit and participate in any transfer or distribution of our securities in connection with a spin-off; may undertake a refinancing, recapitalization, leveraged buyout, or other economic or financial restructuring; or may terminate or cease to exist or dissolve, in any such case without our consent and, provided the transferee expressly assumes and undertakes to perform our obligations in all material respects, do so free of any responsibility or liability whatsoever to you after the transaction occurs. With regard to any of the above sales, assignment and dispositions, you expressly and specifically waive any claims, demands, or damages against us arising from or related to the transfer of the Marks, assets or the System.

C.    Transfers by You. You acknowledge and agree that the rights and duties set forth in this Agreement are personal to you. Accordingly, you will not sub-franchise or otherwise make a Transfer of your rights hereunder or make any lease or sublease of the Store, without our prior written consent which we may withhold in our sole and absolute discretion. Any attempted Transfer without our prior written consent will be a default under the terms of this Agreement and will be voidable by us. Pandora's consent to a Transfer may be conditioned upon any or all of the following requirements, which may be modified from time to time at our discretion::

i.    You are in full compliance with this Agreement, you have no uncured defaults, and all your debts and financial obligations to us under this Agreement or under any other agreement between an entity in which you are an owner, member, or partner and us, our parent, subsidiaries and sister entities, have been satisfied;

ii.    If the proposed transferee is a franchisee of ours at the time of transfer and the proposed transferee, or the proposed transferee along with any entity under common control of the proposed transferee, operates more than two (2) Pandora stores, the proposed transferee can establish to our satisfaction that it has in place, or will obtain, sufficient resources acceptable to us to adequately manage its back office operations, including but not limited to accounting, payroll, marketing, district management, and other responsibilities. For purposes of this section, "entity under common control" means an entity that has as an owner, member or partner, any individual or entity which is also an owner, member, or partner of you.

iii.    If the proposed transferee is a franchisee of ours at the time of transfer, the proposed transferee (or any other entity under common control of the proposed transferee) is in full compliance with all obligations under any agreement with us. For purposes of this section, "entity under common control" means an entity that has as an owner, member or partner, any individual or entity which is also an owner, member, or partner of the proposed transferee

iv.    The proposed transfer involves a complete transfer of all of the assets of the franchised business from the transferor to the transferee.

v.    You execute a written agreement in a form satisfactory to us in which you and your owners covenant to observe all applicable post-term obligations and covenants contained in this Agreement;

vi.    You remain responsible for the performance of all your obligations and undertakings which survive termination of the Agreement;

vii.    The proposed transferee executes our then-current standard form of franchise agreement (which may provide for different fees, and other rights and obligations from those provided in this Agreement);

viii.    The proposed transferee executes a document acknowledging receipt by the proposed transferee of the applicable franchise disclosure documents at least 14 calendar days prior to any such proposed assignment or the payment of any consideration therefor;

24

ix.     You provide to us all information requested by us to evaluate the proposed transferee, including financial statements; the management, business, and educational experience of the transferee; and the financial status of the proposed transferee;

x.      The proposed transferee agrees in writing to perform such maintenance, remodeling and re-equipping of the Store and that we determine necessary to bring the Store in compliance with our then-current standards;

xi.     Before the date of the proposed Transfer, the proposed transferee's Store Manager successfully completes such training and instruction as we deem necessary;

xii.    We are satisfied that the proposed transferee meets all of the requirements of our new franchisees applicable on the date we receive notice of the proposed transfer and including, but not limited to, good reputation and character, business experience, management experience, community involvement and contacts and financial strength and liquidity;

xiii.   You and all holders of an interest in you execute a general release, in the form prescribed by us, releasing, to the fullest extent permitted by law, all claims that you or any of your owners may have against us or our affiliates, including our and their respective shareholders, officers, directors and employees, in both their individual and corporate capacities;

xiv.    You pay us a Transfer fee of $2,000 to process your transfer request; and

xv.     You provide to us all legal documents related to the proposed transfer transaction and the documents are satisfactory to us, in our sole discretion.

xvi.    You provide to assignee and us such financial reports and other data relating to the Store and its operations as we deem reasonably necessary or appropriate for assignee and us to evaluate the Store and the proposed transfer.  You agree that we have the right to confer with proposed assignees and furnish them with information concerning the Store and proposed transfer without being held liable to you, except for intentional misstatements made to a proposed assignee.  Any information furnished by us to proposed assignees is for the sole purpose of permitting the assignees to evaluate the Store and proposed Transfer and must not be construed in any manner or form whatsoever as earnings claims or claims of success or failure.

D.      Transfer by Individual Franchisee to an Entity.  This Agreement may be transferred to an entity without the payment of a Transfer fee and without complying with Section 12.C if you (the franchisee) are an individual, provided that you hold the controlling interest in any such entity.

E.      Transfer Upon Death or Disability.  Upon your death, mental incapacity or disability, we shall consent to the transfer of the interest in the franchise, the Store and this Agreement to your spouse, heir or relative by blood or by marriage whether such Transfer is made by will or by operation of law if, in our sole judgment, such person or persons meet our educational, managerial and business standards; successfully completes our training at the earliest opportunity; possess a good moral character, business reputation and credit rating; have the aptitude and ability

25

to operate and manage the Store; have at least the same managerial and financial criteria required by new franchisees; and have sufficient equity capital to operate the Store. If said transfer is not approved by us, then the executor, administrator or personal representative of such person shall transfer his interest to a third party approved by us within six months after such death, mental incapacity or disability. Such transfer shall be subject to the same conditions as any other transfer except that no transfer fee will be charged.

F.     <u>Right of First Refusal.</u>

    i.     If you and a third party ("**Third Party**") agree to make a Transfer to such third party ("**Offer to Transfer**"), you must first present us the right to purchase such rights from you according to the same terms and conditions set forth in the Offer to Transfer ("**Our Right of First Refusal**"). To do so, you must deliver to us a writing, signed by you, the Third Party, and any other individuals or entities needed to effectuate the transaction, that contains the purchase price (including or excluding inventory), payment terms, and any other material terms and conditions of the Offer to Transfer ("**Written Offer to Transfer**"). If we do not respond to the Written Offer to Transfer within thirty days of our receipt of the Written Offer to Transfer, we will have waived our rights to exercise Our Right of First Refusal. You must discontinue your due diligence related to the Transfer and discontinue negotiations with the Third Party until we either notify you or our intent to exercise Our Right of First Refusal or have waived our rights to exercise Our Right of First Refusal.

    ii.     If we exercise Our Right of First Refusal and provide you with a Notice of Intent to Purchase, we will begin negotiating the terms of our purchase of your Store, provided, however, we will have the right to substitute equivalent cash for any noncash consideration included in the Written Offer to Transfer or to modify the price if a modification of the price is justified by any due diligence we conduct. Accordingly, you acknowledge and agree that once you submit the Written Offer to Transfer to us, you cannot modify the purchase price included in such Written Offer to Transfer, even if you or the Third Party perform due diligence after you have submitted to us the Written Offer to Transfer, and such due diligence results in you or the Third Party desiring a modification to the purchase price. In addition, unless otherwise agreed to in writing by us and you, we will prepare the transaction documents to effectuate the transaction described in the Written Offer to Transfer.

    iii.     If we refuse to accept the Written Offer to Transfer and provide you with a Waiver Notice, Our Right of First Refusal will lapse and be of no further force or effect for that particular Written Offer to Transfer only. The proposed transfer to the third party will be governed by paragraph 12 C as well as the provisions of this subparagraph. Within 30 days after your receipt of the Waiver Notice, you must provide us with all of the information we need to evaluate the Third Party's application to join our franchise system. If we approve the Third Party's application, you and the Third Party must then effectuate the transaction described in the Written Offer to Transfer within 60 days of our approval. If you and the Third Party fail to effectuate the transaction within such **60**-day period, the Transfer of your rights to operate the Store pursuant to the Written Offer to Transfer will not be permitted by us. In the event that any of the terms and conditions set forth in the

Written Offer to Transfer change with such **60**-day period, or you present or receive a new Offer to Transfer to the same Third Party or any other third party at any time during or after such **60**-day period, you must first offer the same to us in accordance with this subparagraph 12.F.

## 13.   DISPUTE RESOLUTION

The following provisions apply with respect to dispute resolution:

A.   Arbitration; Mediation.

     i.     Except as qualified below, any dispute between you and us or any of our or your affiliates arising under, out of, in connection with or in relation to this Agreement, any lease or sublease for the Store or Authorized Location, the parties' relationship, or the business must be submitted to binding arbitration under the authority of the Federal Arbitration Act and must be arbitrated under the auspices of the American Arbitration Association and pursuant to the rules of the American Arbitration Association including, but not limited to, its Commercial Arbitration Rules and its Optional Appellate Arbitration Rules.. The arbitration must take place in the city where our headquarters are located at the time of the dispute, or at such other place as may be mutually agreeable to the parties. The arbitrators must follow the law and not disregard the terms of this Agreement. The decision of the arbitrators will be final and binding on all parties to the dispute; however, the arbitrators may not under any circumstances: (i) stay the effectiveness of any pending termination of this Agreement; (ii) assess punitive or exemplary damages; or (iii) make any award which extends, modifies or suspends any lawful term of this Agreement or any reasonable standard of business performance that we set. A judgment may be entered upon the arbitration award by any state or federal court where we maintain our headquarters or the state where your Store is located.

     ii.     Before the filing of any arbitration, the parties agree to mediate any dispute that does not include injunctive relief or specific performance actions covered under subparagraph 13.B, provided that the party seeking mediation notifies the other party of its intent to mediate prior to the termination of this Agreement. Mediation will be conducted by a mediator or mediation program agreed to by the parties. Persons authorized to settle the dispute must attend any mediation session. The parties agree to participate in the mediation proceedings in good faith with the intention of resolving the dispute if at all possible within 30 days of the notice from the party seeking to initiate the mediation procedures. If not resolved within 30 days or if one party refuses to participate in mediation, the parties are free to pursue arbitration. Mediation is a compromise negotiation for purposes of the federal and state rules of evidence, and the entire process is confidential.

     iii.     **ANY LAWSUIT, CLAIM, COUNTERCLAIM, OR OTHER ACTION MUST BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS, AND MUST NOT BE AS PART OF A CONSOLIDATED, COMMON, OR CLASS ACTION.**

B.     Choice of Forum.  This Agreement shall for all purposes be governed by and construed in accordance with the laws of the Republic of Guatemala and the laws of the Republic of Guatemala applicable therein and the Guarantor hereby irrevocably submits to the jurisdiction of the courts of Guatemala City.

C.     Notwithstanding any of the foregoing or anything else in this Agreement to the contrary, we may seek equitable or injunctive relief in any jurisdiction competent to grant such relief and that can exercise jurisdiction over you.

D.     Injunctive Relief.  Notwithstanding subparagraph 13.A above, you recognize that the Store is one of a large number of similarly situated Stores identified by the Marks and similarly situated and selling the Products to the public, and that the failure on the part of a single franchisee to comply with the terms of its agreement could cause irreparable damage to us and/or to some or all of our other franchisees.  Therefore, it is mutually agreed that in the event of a breach or threatened breach of any of the terms of this Agreement by you, we will forthwith be entitled to an injunction restraining such breach or to a decree of specific performance, without showing or proving any actual damage, together with recovery of reasonable attorneys' fees and other costs incurred in obtaining said equitable relief, until such time as a final and binding determination is made by the arbitrators.  The foregoing equitable remedies are in addition to, and not in lieu of, all other remedies or rights that the parties might otherwise have by virtue of any breach of this Agreement by the other party.  Finally, either party has the right to commence a civil action against the other party or take other appropriate action in the following circumstances:  disputes and controversies arising under the Lanham Act, as now or hereafter amended, relating to ownership or validity of the Proprietary Marks or if you or we seek injunctive relief, specific performance, or other extraordinary relief.Attorneys' Fees.  The prevailing party in any action or proceeding arising under, out of, in connection with, or in relation to this Agreement, any lease or sublease for the Store or Authorized Location, or the business will be entitled to recover its reasonable attorneys' fees, costs, and expenses, and interest on such fees, costs, and expenses.

E.     Enforcement.  During the term of this Agreement, if you do not give us written notice of the alleged breach of this Agreement within one year from the date that you have knowledge of circumstances reasonably causing you to believe you may have a claim for a breach of this Agreement by us, then the alleged breach will be deemed to be waived by you in all respects and you will be barred from bringing any legal or other action against us for the alleged breach.  Furthermore, upon expiration or termination of this Agreement, you may not assert any claim or cause of action against us arising under, out of, or in any way connected with or related to this Agreement, the relationship between the parties, or your Store unless the claim or cause of action is commenced within one year after the effective date of the expiration or termination of this Agreement.  Notwithstanding the preceding two sentences, if the one-year time limitation is prohibited by or invalid under any applicable law, then no suit or action may be commenced or maintained unless it is commenced within the shortest applicable statute of limitations.

## 14.     LIMITATION OF LIABILITY

**A.     Consequential and Indirect Damages.  IN NO EVENT SHALL WE BE LIABLE TO YOU FOR CONSEQUENTIAL, INDIRECT, SPECIAL, AND PUNITIVE DAMAGES, INCLUDING BUT NOT LIMITED TO DAMAGE RESULTING FROM LATE**

28

**DELIVERY, LOSS OF PROFIT, LOSS OF GOODWILL, OR LOSS CAUSED BY THE DEFECTIVE PRODUCTS.**

B. <u>Limitation of Liability</u>. Our liability to you shall be limited to the amount paid by you to us or our affiliate for all the Products delivered in the period of six (6) calendar months prior to the incident which gave rise to your loss less any credits we or our affiliate provided to you.

C. <u>Applicability of Limitation of Liability</u>. The limitation of liability set forth herein shall also apply to our parents and our affiliates. This provision is an irrevocable third party beneficiary clause for the duration of this Agreement and after the termination or expiration of this Agreement.

### 15. <u>DEFAULT AND TERMINATION</u>

The following provisions apply with respect to default and termination:

A. <u>Termination by Us</u>. We have the right to terminate this Agreement in accordance with the following provisions:

i. <u>Termination After Opportunity to Cure</u>. You will be deemed to be in default under this Agreement and we have good cause to terminate this Agreement and all rights granted under this Agreement if within thirty (30) days after we send you written notification setting out the nature of the default ("**Notice to Cure**"), or within any shorter period expressly set forth in the following clauses as to such default, you do not correct the default to our satisfaction:

(1) <u>Nonpayment</u>: If you fail or refuse to pay as and when due any sums owed to us, any of our affiliates, or any of our designated suppliers or vendors within ten (10) days of receiving a Notice to Cure from us;

(2) <u>Failure to Submit Required Reports</u>: If you fail or refuse to submit required reports to us within ten (10) days of receiving a Notice to Cure from us;

(3) <u>Disputes Between or Among Franchisee Principals</u>: If you fail to resolve any dispute between or among principals or shareholders of your franchisee entity regarding the operation of the business of the Store;

(4) <u>Standards and Policies</u>: If you fail or refuse to comply with mandatory or required standards and policies set forth in this Agreement or the Manual or any changes, additions, or modifications thereto, or fail or refuse to implement a required or mandatory program, module, or materials;

29

(5)     <u>Scorecard</u>: You fail to cure EIO (scorecard) deficiencies within the specified time frames;

(6)     <u>Permits and Licenses; Compliance</u>: If you fail or refuse to obtain and maintain all necessary permits and licenses, or fail or refuse to comply with applicable laws or regulations, relating to the operation of the Store;

(7)     <u>Assumption of Control</u>: If you fail or refuse to provide an individual acceptable to us to assume control of the Store in the event of (a) your death or incapacity or (b) the death or absence from active participation in the Store's business of any individual upon whose ability or expertise we relied in granting this franchise to you; or

(8)     <u>Any Other Breach of this Agreement</u>: If you breach any other provision of this Agreement which is not specified in Section A (ii), below.

    ii.     <u>Immediate Termination with No Opportunity to Cure</u>. In the event any of the following defaults occur, you will have no right or opportunity to cure the default and this Agreement will terminate effective immediately on our issuance of written notice of termination:

(1)     Any material misrepresentation, omission or falsification of information in your franchise application or in records or reports submitted to us;

(2)     Your voluntary abandonment of this Agreement, the Authorized Location, or the Store;

(3)     The expiration or termination of your lease, the failure to timely cure a default under the lease, or the loss of your right of possession;

(4)     Any unauthorized use of the Confidential Information;

(5)     Insolvency of you or a guarantor;

(6)     You or a guarantor makes an assignment or enters into any similar arrangement for the benefit of creditors;

(7)     Conviction of you or an owner or a guarantor of (or pleading no contest to) a felony of any nature or any misdemeanor that brings or tends to bring any of the Marks into disrepute or impairs or tends to impair your reputation or the goodwill of the Marks or the Store;

(8)     Any unauthorized transfer or assignment;

(9) Your third default of the same or similar provision within any 12-month consecutive period;

(10) You refuse to permit, or try to hinder, an examination or audit of your books and records or an inspection of the Store as provided in this Agreement;

(11) You fail to successfully complete all required training.

(12) You engage in any conduct or practice that is fraudulent, unfair, unethical, or a deceptive practice."

(13) Any act by you or anyone affiliated with the Store which causes, or is likely to cause, an incurable tarnishing of our reputation.

iii. <u>Immediate Termination after No More than 24 Hours to Cure</u>. In the event that a default under this Agreement occurs that materially impairs the goodwill associated with any of the Intellectual Property or the Marks (including the misuse or the making of an unauthorized use of any of the Intellectual Property or the Marks or the commission of any other act by you which can be reasonably expected to impair the goodwill associated with any of the Marks), violates any health or safety law or regulation, or presents a safety hazard to your customers or to the public: (i) you will have no more than 24 hours after we provide written notice of the default to cure the default; and (ii) this Agreement will terminate effective immediately on our issuance of written notice of termination.

iv. <u>Effect of Other Laws</u>. The provisions of any valid, applicable law or regulation prescribing permissible grounds, cure rights or minimum periods of notice for termination of this franchise supersede any provision of this Agreement that is less favorable to you.

v. <u>Cross Default</u>. A default of the type listed below under any other agreement between you (or any entity under common control with you) and us (or our parent, sister or subsidiary entities) constitutes a default under this Agreement or any other agreement between you (or any entity under common control with you) and us:

(1) The non-payment of amounts owed to us (or our parent, sister or subsidiary entities ) for a loan made to you or your affiliates;

(2) The unauthorized use of the Intellectual Property;

(3) The unauthorized use of information we designate as confidential or proprietary;

(4) The abandonment of any PANDORA Store owned and/or operated by you or your affiliates;

(5) Your, your affiliate's, or any principal owner's declaration of insolvency or any adjudication of insolvency;

31

(6) The filing a petition in bankruptcy, reorganization or similar procedure, or requesting or having appointed a receiver for any PANDORA store, assets or property in which you or your affiliates have an interest;

(7) Conviction of you or an owner or a guarantor of you (or pleading no contest to) any misdemeanor that brings or tends to bring any of the Marks into disrepute or impairs or tends to impair your reputation or the goodwill of the Marks or the Store or any felony; or

(8) The unauthorized assignment of any controlling interest in an Agreement.

For purposes of this section, "entity under common control" means a store operated by an entity that has as an owner, member or partner, any individual or entity which is also an owner, member, or partner of you.vi. <u>Other Remedies</u>. In the event of your default for which we have the right to terminate this Agreement under this Section 15, we have the right to undertake any one (1) or more of the following actions instead of terminating this Agreement:

(1) We may disable access to or remove all or any references to the Store or webpage(s) of the Store from our website, until such time as the default is fully cured;

(2) We may withhold from you certain benefits, plans, promotions or products that might be available to other franchisees, and/or we may not authorize you to engage in certain activities, or participate in certain meetings or events, unless and until you cure your default(s) and operate in compliance with this Agreement and our rules, policies and standards;

(3) We may require you to provide us with a detailed business plan in such form and containing such content as we may specify; and/or

(4) We may modify or eliminate any of the territorial protections, or your rights to sell products in certain sales channels, as provided for in Section 2 above.

If any of such rights, options, arrangements, or areas are terminated or modified in accordance with this Section 15.A.vi, such action shall be without prejudice to our right to terminate this Agreement in accordance with Sections 15.A or 15.B, and/or to terminate any other rights, options or arrangements under this Agreement at any time thereafter for the same default or as a result of any additional defaults of the terms of this Agreement.

B.    <u>Lien</u>. In the event of termination for any default made by you, the extent of all damage which we suffer by virtue of such default shall be and remain a lien in our favor against any and all of the personal property, fixtures, equipment and inventory owned by you on the Store premises at the time of such default.

32

C.    Termination by You.  You may terminate this Agreement as a result of our breach of a material provision of this Agreement provided that: (i) you provide us with written notice of the breach that identifies the grounds for the breach; and (ii) we fail to cure the breach within 30 days after our receipt of the written notice, or, if the breach cannot be cured within 30 days, we fail to begin to cure.  If we fail to cure the breach, the termination will be effective 60 days after our receipt of your written notice of breach.  Your termination of this Agreement under this Section will not release or modify your post-term obligations under Section 16 of this Agreement.

## 16.    POST-TERM OBLIGATIONS

A.    General.  Upon expiration or termination of this Agreement:

i.    Your authorization to use in any manner the Marks, our name or any confusingly similar name shall terminate.  You must not thereafter, directly or indirectly, identify yourself in any manner as a franchisee; publicly identify yourself as a former franchisee; or use any of our confidential information, Marks, signs, symbols, devices, procedures, or other materials constituting part of the System.

ii.    You must vacate the Store premises immediately, or, at our option, immediately make such removals or changes in signs and colors of the premises as we request so as to distinguish effectively the premises from their former appearance and from other Pandora stores.  If you fail to make such changes, then we may enter the premises and make such changes at your expense.  If the premises are not subleased by us or our Affiliates to you, we will have the option to require you to assign your leasehold interest in the premises to us.

iii.    You must return to us all copies of documents, instructions (including all data instruction material), manuals, display items, materials, promotional aids, and all writings bearing the PANDORA Marks or name.  You must also comply with your obligations under Section 11.F of this Agreement, and cooperate to assure that telephone listings and numbers for the Store are assigned to us (or our designee).

iv.    You must immediately cease all use and display of the Marks and of any proprietary material (including the Manual) and of all or any portion of marketing materials furnished or approved by us.  You must also cancel or assign, at our option, any assumed name rights or equivalent registrations filed with authorities Unless otherwise agreed in writing by the Franchisor, all instruction manuals, sales brochures, booklets, posters, promotional literature and any other materials in which the Intellectual Property Rights are used shall be disposed of in such manner and as such time as may be instructed by the Franchisor. Upon request by the Franchisor, the Franchisee shall provide the Franchisor with proof of the destruction of these materials.

v.    You must immediately pay all sums due to us, our affiliates, or our designees, and all sums  you owe to third parties that have been guaranteed by us or any of our affiliates.

B.    Our Option to Purchase.  Upon the termination or expiration of this Agreement, we have the option to purchase all of your rights, title and interest in the Store including all equipment,

33

inventory, accounts, contract rights and other business assets ("**Assets**") free and clear of all liens, claims and other encumbrances. The purchase price for the Assets will be the lesser of: (i) the market value of the Assets, or (ii) your cost less depreciation on a straight line basis of 10% per year. If the parties cannot agree on the market value within 30 days, an independent appraiser will be designated by each of the parties, and an average of the two appraised values will be binding. Appraised values will exclude any and all consideration for goodwill or going concern value created by the Marks and System licensed to you.

      C.     <u>Liability</u>. Notwithstanding the foregoing, in the event of expiration or termination of this Agreement, you will remain liable for your obligations pursuant to this Agreement or any other agreement between you and us or our affiliates, that expressly or by their nature, survive the expiration or termination of this Agreement.

17.    <u>GENERAL PROVISIONS</u>

      The parties agree to the following provisions:

      A.     <u>Severability</u>. Should one or more clauses of this Agreement be held void or unenforceable for any reason by any court of competent jurisdiction, such clause or clauses will be deemed to be separable in such jurisdiction and the remainder of this Agreement is valid and in full force and effect and the terms of this Agreement must be equitably adjusted so as to compensate the appropriate party for any consideration lost because of the elimination of such clause or clauses. It is the intent and expectation of each of the parties that each provision of this Agreement will be honored, carried out and enforced as written. Consequently, each of the parties agrees that any provision of this Agreement sought to be enforced in any proceeding must, at the election of the party seeking enforcement and notwithstanding the availability of an adequate remedy at law, be enforced by specific performance or any other equitable remedy.

      B.     <u>Waiver/Integration</u>. No waiver by us of any breach by you, nor any delay or failure by us to enforce any provision of this Agreement, may be deemed to be a waiver of any other or subsequent breach or be deemed an estoppel to enforce our rights with respect to that or any other or subsequent breach. Subject to our rights to modify Appendices and/or standards and as otherwise provided herein, this Agreement may not be waived, altered or rescinded, in whole or in part, except by a writing signed by you and us. This Agreement together with the addenda and appendices hereto and the application form executed by you requesting us to enter into this Agreement constitute the sole agreement between the parties with respect to the entire subject matter of this Agreement and embody all prior agreements and negotiations with respect to the business. You acknowledge and agree that you have not received any warranty or guarantee, express or implied, as to the potential volume, profits or success of your business. There are no representations or warranties of any kind, express or implied, except as contained herein and in the aforesaid application. Nothing in this Agreement or in any other related agreement is intended to disclaim representations made in our Franchise Disclosure Document that was furnished to you.

      C.     <u>Notices</u>. All notices sent by one party to the other must be hand-delivered, sent by registered or certified mail, return receipt requested, or sent via nationally-recognized overnight courier. Notices will be considered given and received upon actual receipt. Notices shall be sent to the parties at the addresses below:

34

| If to us: | Pandora Franchising, LLC |
| | 250 West Pratt Street |
| | Baltimore, Maryland 21201 |
| | Att'n: General Counsel |
| | |
| If to you: | MA Group, S.A. |
| | Calle 51 Bella Vista |
| | Edificio Habitat Piso M |
| | Att'n:_Rajesh Mohinani |

D.    Successors/Assigns.  Subject to the terms of Section 12 hereof, this Agreement is binding upon and inures to the benefit of the administrators, executors, heirs, successors and assigns of the parties.

E.    Interpretation of Rights and Obligations.  The following provisions apply to and govern the interpretation of this Agreement, the parties' rights under this Agreement, and the relationship between the parties:

   i.    Applicable Law and Venue.  This Agreement shall for all purposes be governed by and construed in accordance with the laws of the Republic of Guatemala and the laws of the Republic of Guatemala applicable therein and the Guarantor hereby irrevocably submits to the jurisdiction of the courts of Guatemala City.

   ii.    Our Rights.  Whenever this Agreement provides that we have a certain right, that right is absolute and the parties intend that our exercise of that right will not be subject to any limitation or review.  We have the right to operate, administrate, develop, and change the System in any manner that is not specifically precluded by the provisions of this Agreement, although this right does not modify any express limitations set forth in this Agreement.

      (1)    Our Reasonable Business Judgment.  Whenever we reserve discretion in a particular area or where we agree to exercise our rights reasonably or in good faith, we will satisfy our obligations whenever we exercise Reasonable Business Judgment in making our decision or exercising our rights.  Our decisions or actions will be deemed to be the result of Reasonable Business Judgment, even if other reasonable or even arguably preferable alternatives are available, if our decision or action is intended, in whole or significant part, to promote or benefit the System generally even if the decision or action also promotes our financial or other individual interest.  Examples of items that will promote or benefit the System include, without limitation, enhancing the value of the Marks, improving customer service and satisfaction, improving product quality, improving uniformity, enhancing or encouraging modernization and improving the competitive position of the System.

35

F.    Relationship of the Parties.  This is not intended to be a distribution agreement under Guatemalan law and the parties agree it should not be interpreted as such.  You and we are independent contractors.  Neither party is the legal representative, partner, subsidiary, joint venture, distributor, sales agent, dependent agent, independent agent, or employee of the other. Neither party may obligate the other or represent any right to do so.  This Agreement does not reflect or create a fiduciary relationship or a relationship of special trust or confidence.

G.    Force Majeure.  In the event of any failure of performance of this Agreement according to its terms by any party, it will not be deemed a breach of this Agreement if it arose from a cause beyond the control of and without the negligence of said party.  Such causes include, but are not limited to the following:

   i.    Acts of God, including flood, earthquake, windstorm or other natural disaster;

   ii.    war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, breaking off of diplomatic relations or similar actions;

   iii.    terrorist attack, civil war, civil commotion or riots;

   iv.    nuclear, chemical or biological contamination or sonic boom;

   v.    any law or government order, rule, regulation or direction, or any action taken by a government or public authority, including but not limited to imposing an embargo, export or import restriction, quota or other restriction or prohibition, or failing to grant a necessary license or consent;

   vi.    fire, explosion (other than in each case one caused by a breach of contract by, or assistance of, the party seeking to rely on this clause or companies in the same group as such party) or accidental damage;

   vii.    loss at sea;

   viii.    extreme adverse weather conditions;

   ix.    collapse of building structures, failure of plant machinery, machinery, computers or vehicles;

   x.    any labor dispute, including strikes, industrial action or lockouts;

   xi.    interruption or failure of utility service, including but not limited to electric power, gas or water.

H.    Interpretation.

In this Agreement:

i. where the context so requires, words importing the singular only shall be construed as including the plural and vice versa and words importing the masculine shall be construed as including the feminine or the neutral and vice versa;

ii. a reference to a clause or schedule is a reference to a clause or schedule of this Agreement;

iii. all references to expressions of time shall be construed by reference to the Gregorian calendar;

iv. a reference to a person includes a reference to a corporation, limited liability company, or partnership.

I.     Schedules, etc.   The Schedules, Annexes, Manual and any amendments to this Agreement form an integral part of this Agreement and shall have the same force and effect as if set out in the body of this Agreement and references to this Agreement include the Schedules, Annexes and the Manual, in each case as amended from time to time.

J.     Headings.  The headings of this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

K.     Conflict of Documents.  If there is any conflict or inconsistency between a term in the body of this Agreement and a term in any of the schedules or other documents referred to or otherwise incorporated into this Agreement, the term in the body of this Agreement shall take precedence, unless the schedule or other document which is incorporated into this Agreement explicitly states that it takes precedence over the body of this Agreement.

L.     Adaptations and Variances.  Complete and detailed uniformity under many varying conditions may not always be possible, practical, or in the best interest of the System. Accordingly, we have the right to vary the authorized merchandise and other standards, specifications, and requirements for any customs or circumstances of a particular franchise or operating agreement, site or location, population density, business potential, existing business practice, competitive circumstance or any other condition that we deem to be of importance to the operation of such Store, franchisee's business or the System.  We are not required to grant to you a like or other variation as a result of any variation from standard specifications or requirements granted to any other franchisee.  You acknowledge that not every franchisee may benefit equally from donations received from national account donors.

M.     Security Interest.  As security for all of your monetary and other obligations to us or our affiliates, you grant to us a first priority security interest in all of your assets, including all furniture, fixtures, machinery, equipment, inventory, and other property, tangible or intangible, now owned or later acquired by you used in connection with the Store and wherever located, as well as all of your contractual and related rights under this Agreement and all other agreements between the parties.  You agree to execute such financing statements, continuation statements, notices of lien, assignments, or other documents as may be required in order to perfect and maintain our security interest.  You shall pay all filing fees and costs for perfecting our security interest.

N.      <u>Waiver of Jury Trial</u>. THE PARTIES MUTUALLY AND WILLINGLY WAIVE THE RIGHT TO A TRIAL BY JURY OF ANY AND ALL CLAIMS MADE BETWEEN THEM, WHETHER NOW EXISTING OR ARISING IN THE FUTURE, INCLUDING ANY AND ALL CLAIMS, DEFENSES, COUNTERCLAIMS, CROSS-CLAIMS, THIRD PARTY CLAIMS, AND INTERVENOR'S CLAIMS, WHETHER ARISING FROM OR RELATED TO THE SALE, NEGOTIATION, EXECUTION, OR PERFORMANCE OF THE TRANSACTIONS TO WHICH THIS AGREEMENT RELATES.

O.      <u>Waiver of Punitive Damages</u>. YOU AND WE (AND OUR RESPECTIVE AFFILIATES, OWNERS AND GUARANTORS, AS APPLICABLE) AGREE TO WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO OR CLAIM FOR ANY PUNITIVE, SPECIAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF ANY DISPUTE BETWEEN US, EACH WILL BE LIMITED TO THE RECOVERY OF ACTUAL DAMAGES SUSTAINED BY IT.

P.      <u>Notice of Potential Profit</u>. We and/or our affiliates will from time to time make available to you goods, products and services for use in your Store on the sale of which we and/or our affiliates will make a profit. Further, we and/or out affiliates may from time to time receive consideration from suppliers and manufacturers in respect to sales of goods, product or services to you or in consideration of services rendered or rights licensed to such persons. You agree that we and/or our affiliates are entitled to said profits and/or consideration.

*[Signature page to follow]*

**IN WITNESS WHEREOF**, the parties have executed this Franchise Agreement as of the dates written below.

**FRANCHISEE:**

Date: _____

MA GROUP, S.A.

a Guatemalan Corporation

By: _____

Name: Rajesh Mohinani

Title: OWNER/SHAREHOLDER

Witness: _Daysireé Batista_

(Witness Name)

Signature: _____

(Witness Signature)

**PANDORA FRANCHISING, LLC**

Date: MAY 8, 2017

By: _____

Name: TRACEY GRIFFIN

Title: TREASURER

39

# APPENDIX A TO FRANCHISE AGREEMENT

## PERSONAL GUARANTEE AND AGREEMENT TO BE BOUND
## PERSONALLY BY THE TERMS AND CONDITIONS
## OF THE FRANCHISE AGREEMENT

In consideration of the execution of the Franchise Agreement by Pandora Franchising, LLC, and for other good and valuable consideration, the undersigned, for themselves, their heirs, successors, and assigns, do jointly, individually and severally hereby become surety and guarantor for the payment of all amounts and the performance of the covenants, terms and conditions in the Franchise Agreement, to be paid, kept and performed by the Franchisee, including without limitation the confidentiality, transfer, non-compete, arbitration and other dispute resolution provisions of the Agreement.

Further, the undersigned, individually and jointly, hereby agree to be personally bound by each and every condition and term contained in the Franchise Agreement and agree that this Personal Guarantee should be construed as though the undersigned and each of them executed a Franchise Agreement containing the identical terms and conditions of this Franchise Agreement.

The undersigned waives: (1) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; (2) protest and notice of default to any party respecting the indebtedness or nonperformance of any obligations hereby guaranteed; and (3) any right he/she may have to require that an action be brought against you or any other person as a condition of liability.

In addition, the undersigned consents and agrees that: (1) the undersigned's liability will not be contingent or conditioned upon our pursuit of any remedies against the franchisee or any other person; and (2) such liability will not be diminished, relieved or otherwise affected by the Franchisee's insolvency, bankruptcy or reorganization, the invalidity, illegality or unenforceability of all or any part of the Franchise Agreement, or the amendment or extension of the Franchise Agreement with or without notice to the undersigned.

It is further understood and agreed by the undersigned that the provisions, covenants and conditions of this Guarantee will inure to the benefit of our successors and assigns.

*[Signatures appear on the following page.]*

FRANCHISEE: MA Group, S.A.
PERSONAL GUARANTORS

| | |
|---|---|
| _____ | _____ |
| Individually | Individually |
| Rajesh Mohinani | Rahul Aswani |
| Print Name | Print Name |
| Calle Colombia, Edificio Allure Piso 41A | C/Princesa Teguise 21, 35510 Tias Lanzarote |
| Address | Address |
| Panama City, Panama | Canary Islands, Spain |
| City          State          Zip Code | City          State          Zip Code |
| _____ | _____ |
| Telephone | Telephone |

# APPENDIX B TO FRANCHISE AGREEMENT

## Acknowledgment Addendum
## to the Franchise Agreement

As you know, you and we are entering into a Franchise Agreement for the operation of PANDORA Store. The purpose of this Acknowledgment Addendum is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, and to be certain that you understand the limitations on claims that may be made by you by reason of the offer and sale of the franchise and operation of your business. Please review each of the following questions carefully and provide honest responses to each question.

## Acknowledgments and Representations.*

1.  Did you receive a copy of our Disclosure Document (and all exhibits and attachments) at least (a) 14 calendar days prior to signing the Franchise Agreement, or (b) if you are a resident of Iowa, New York, Oklahoma or Rhode Island, at the earlier or the first personal meeting or 10 business days before the execution of the franchise or other agreement or payment of any consideration, or (c) if you are a resident of Michigan, Oregon, Washington or Wisconsin, at the earlier of 10 business days before the execution of any binding agreement or payment of any consideration? Check one: (✓) Yes ( ) No. If no, please comment: _____

2.  Have you studied and reviewed carefully our Disclosure Document and Franchise Agreement? Check one: ( ) Yes ( ) No. If no, please comment: _____
_____

3.  Did you understand all the information contained in both the Disclosure Document and Franchise Agreement? Check one (✓) Yes ( ) No. If no, please comment: _____
_____

4.  Was any oral, written or visual claim or representation made to you which contradicted the disclosures in the Disclosure Document? Check one: (✓) No ( ) Yes. If yes, please state in detail the oral, written or visual claim or representation: _____
_____

5.  Did any employee or other person speaking on behalf of Pandora Franchising, LLC make any oral, written or visual claim, statement, promise or representation to you that stated, suggested, predicted or projected sales, revenues, expenses, earnings, income or profit levels at any Pandora Jewelry location or business, or the likelihood of success at your franchised business? Check one: (✓) No ( ) Yes. If yes, please state in detail the oral, written or visual claim or representation: _____
_____

6.  Do you understand that that the franchise granted is for the right to operate a Pandora Store in the Mall only and that we have the right, subject only to the limited rights granted to you under the Franchise Agreement, to issue franchises or operate competing businesses for or

at locations, as determined by us, near your Store?  Check one:  ( ✓ ) Yes  ( ) No.  If no, please comment: _____

_____

7.  Do you understand that the Franchise Agreement contains the entire agreement between you and us concerning the Store, meaning that any prior oral or written statements not set out in the Franchise Agreement will not be binding?  Check one:  ( ✓ ) Yes  ( ) No.  If no, please comment: _____

_____

8.  Do you understand that the success or failure of your Store will depend in large part upon your skills and experience, your business acumen, the location of your Designated Territory, the local market for products under the Pandora Jewelry marks, interest rates, the economy, inflation, the number of employees you hire and their compensation, competition and other economic and business factors?  Further, do you understand that the economic and business factors that exist at the time you open your Store may change?  Check one ( ✓ ) Yes  ( ) No.  If no, please comment: _____

_____

9.  Do you understand that you may be required to purchase products and services for the Store from a single source of supply, and that we and/or our affiliates may be that source?  Do you understand that you will pay the then-current price in effect for all products and services you purchase from us and/or our affiliates, and that we may make a profit on those purchases?  Check one ( ✓ ) Yes  ( ) No.  If no, please comment: _____

_____

_____

10.  "Do you acknowledge and represent to us that (a) you or the entity that you form to be a franchisee will be the employer of all of your employees and will have sole discretion and authority to hire, fire, discipline, compensate and schedule working hours for, all of your employees; and (b) we and our affiliates will have no control, or right to control, any of the employment actions or decisions in your business?  ?  Check one ( ✓ ) Yes  ( ) No.  If no, please comment: _____

_____

We recommend that you retain employment law counsel to advise you with your employment issues and questions.

11.  Have you discussed with an attorney, accountant, or other professional advisor the benefits and risks of establishing and operating a Store as a franchised business?  Check one ( ✓ ) Yes ( ✓ ) No.  If no, please comment: _____

_____

12.  YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM.  BY SIGNING THIS ADDENDUM, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.  IF

MORE SPACE IS NEEDED FOR ANY ANSWER, CONTINUE ON A SEPARATE
SHEET AND ATTACH.

NOTE: IF THE RECIPIENT IS A CORPORATION, PARTNERSHIP, LIMITED LIABILITY
COMPANY OR OTHER ENTITY, EACH OF ITS PRINCIPAL OWNER AND MINORITY
OWNERS MUST EXECUTE THIS ACKNOWLEDGMENT.

Signed: _____       Signed: _____

Print Name: Rajesh Mohinani              Print Name: Rahul Aswani

Date: _____          Date: _____


**APPROVED ON BEHALF OF**
**PANDORA FRANCHISING, LLC**

Signed: _____       Signed: _____

Print Name: Tracey Griffin               Print Name: _____

Date: May 8, 2017                        Date: _____

*Such representations are not intended to nor shall they act as a release, estoppel or waiver of any
liability incurred under the Illinois Franchise Disclosure Law or the Maryland Franchise Registration
and Disclosure Law. Except to the extent we have negotiated changes to the Franchise Agreement
that differ from the FDD, nothing in this Acknowledgment Addendum or in any related agreement
is intended to disclaim representations made in Pandora Franchising, LLC's FDD that was furnished
to you.

B-3

## APPENDIX C TO FRANCHISE AGREEMENT
## PANDORA FRANCHISING, LLC
### LEASE PROVISIONS

After you and Pandora Franchising, LLC ("**we**," "**us**" or "**Pandora**") mutually consent to the proposed location of the Store, you must take steps to execute a lease (if the premises are to be leased) or reach a binding agreement to purchase the site. As a condition of our approval, we may require the lease to contain certain provisions, including the following:

A. Allow us to elect to receive an assignment of your leasehold interest upon termination or expiration of the Franchise Agreement;

B. Require your lessor concurrently to (1) provide us with a copy of any written notice to you of deficiency under the lease, and (2) allow us the right (but not the obligation) to cure any deficiency under the lease, if you fail to effect a cure within 15 days after your cure period expires. Our address for notices is as follows: Pandora Franchising, LLC, Attn: David Lamb, 250 West Pratt Street, Baltimore, Maryland 21201 and DLamb@pandora.net.

C. Permit you to display the Marks as required by the Franchise Agreement, subject to applicable law;

D. Limit the use of the premises to the operation of a PANDORA Store for the retail sale and display of PANDORA jewelry products and related accessories and gifts customarily sold in PANDORA Stores in the United States.

E. In the event we elect not to assume the lease as contemplated by "B" above, provide us with access to the premises following termination or expiration of the lease to remove all signs and other items identifying the premises as PANDORA Store and to make such other modifications as are reasonably necessary to protect the PANDORA marks and system, and to distinguish the premises from PANDORA Stores generally.

# APPENDIX D TO FRANCHISE AGREEMENT

## PANDORA FRANCHISING, LLC

## NONDISCLOSURE AND NONCOMPETITION AGREEMENT

This Nondisclosure and Noncompetition Agreement ("**Agreement**") is made and entered into this _____ day of _____, 20__, by and between **Pandora Franchising, LLC**, a Maryland limited liability company ("**Company**"), located at 250 West Pratt Street, Baltimore, MD 21201, and _____ ("**Individual**"), who resides at _____. All initially capitalized terms not otherwise defined shall have the meanings specified in the Franchise Agreement as defined below.

### RECITALS

A.      The Company is engaged in the business of selling franchises for the operation of retail businesses selling a unique line of custom jewelry ("**Franchise Business**"). The Franchise Businesses are operated under the Company's trademark "**PANDORA®**" and other service marks, trademarks, logo types, architectural designs, trade dress and other commercial symbols (collectively, the "**Marks**");

B.      The Company has developed methods for establishing, operating and promoting Franchise Businesses in accordance with the Company's distinctive business format, plans, methods, data, processes, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, Marks and information and know-how of the Company ("**Confidential Information**" and "**Trade Secrets**") and such Confidential Information and Trade Secrets as may be further developed from time to time by the Company ("**System**");

C.      The Company and its affiliates have established substantial goodwill and an excellent reputation with respect to the quality of unique jewelry items and other products and services available, which goodwill and reputation have been and will continue to be of major benefit to the Company;

D.      Individual is an owner, shareholder, member, partner, officer, and/or director of _____ ("**Franchisee**") and will receive Confidential Information and Trade Secrets in such capacity.

E.      Individual agrees to the terms of this Agreement as partial consideration for the Company's willingness to allow Franchisee to become a Franchisee of the Company and to have access to the Company's Confidential Information and Trade Secrets.

NOW THEREFORE, in consideration of the foregoing, the mutual promises contained within and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Individual and the Company, intending legally to be bound, agree as follows:

1.    <u>Definitions</u>.

      (a)    "**Competitive Business**" as used in this Agreement means any business that sells or offers to sell bracelets and charms that compete, directly or indirectly, with the

PANDORA charm bracelet product line. For the sake of clarity, Alex and Ani, LLC and Swarovski shall each be considered a Competitive Business.

(b) **"Confidential Information"** shall mean without limitation, all knowledge, know-how, standards, formulas, methods and procedures related to the establishment and operation of the Franchise Business and includes all records pertaining to customers, suppliers, and other service providers of, and/or related in any way to, the Franchise Business including, without limitation, all databases (whether in print, electronic or other form), all names, addresses, phone numbers, e-mail addresses, customer purchase records, mail lists, manuals, promotional and marketing materials, marketing strategies and any other data and information that the Company or its affiliates designates as confidential including all information contained in the Company's Operations Manual, which may be provided as one or more separate manuals, written instructional guides, CD Rom, or other communications from the Company or its affiliates, which may be changed or supplemented from time to time.

(c) **"Franchise Agreement"** shall mean the franchise agreement between Company and _____ ("**Franchisee**") dated _____ as amended or renewed from time to time.

(d) **"Store"** shall have the meaning defined in the Franchise Agreement.

(e) **"Term"** shall have the meaning defined in the Franchise Agreement.

(f) **"Trade Secret(s)"** shall mean information, including a formula, customer lists, pattern, compilation, program, device, method, technique or process related to the Franchise Business that both derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2. <u>Confidential Information and Trade Secrets</u>. Individual and the Company acknowledge that the Confidential Information and Trade Secrets that are developed and utilized in connection with the operation of the Franchise Business is unique and the exclusive property of the Company or its affiliates. Individual acknowledges that any unauthorized disclosure or use of the Confidential Information and Trade Secrets would be wrongful and would cause irreparable injury and harm to the Company or its affiliates. Individual further acknowledges that the Company or its affiliates has expended a great amount of effort and money in obtaining and developing the Confidential Information and Trade Secrets, that the Company or its affiliates has taken numerous precautions to guard the secrecy of the Confidential Information and Trade Secrets, and that it would be very costly for competitors to acquire or duplicate the Confidential Information and Trade Secrets.

3. <u>Nondisclosure of Confidential Information</u>. During the Term and any renewal Term of the Franchise Agreement and for all periods after the Term and any renewal Term of the Franchise Agreement, Individual shall not at any time, publish, disclose, divulge or in any manner communicate to any person, firm, corporation, association, partnership or any other entity

D-2

whatsoever or use, directly or indirectly, for its own benefit or for the benefit of any person, firm, corporation or other entity other than for the use of the Company or the Franchise Business, any of the Confidential Information of the Company or its affiliates.

4.    Exceptions to Disclosing Confidential Information.  Notwithstanding the foregoing, the restrictions on the disclosure and use of the Confidential Information will not apply to the following: (a) information that was in the public domain prior to being communicated to Individual through no fault of Franchisee or Individual; (b) information that entered the public domain after it was communicated to Individual through no fault of Franchisee or Individual; (c) information that was in Individual's possession free of any obligation of confidence at the time it was communicated to Franchisee or Individual; or (d) the disclosure of the Confidential Information in judicial or administrative proceedings to the extent that Individual or Franchisee is legally compelled to disclose the information, if Individual or Franchisee has notified the Company before disclosure and used Individual or Franchisee's best efforts, and afforded the Company the opportunity, to obtain an appropriate protective order or other assurance satisfactory to the Company of confidential treatment for the information required to be so disclosed.

5.    Nondisclosure of Trade Secrets.  During the Term and any renewal Term of the Franchise Agreement and for as long as such information constitutes a Trade Secret, Individual shall not at any time, publish, disclose, divulge or in any manner communicate to any person, firm, corporation, association, partnership or any other entity whatsoever or use, directly or indirectly, for its own benefit or for the benefit of any person, firm, corporation or other entity other than for the use of the Company or the Franchise Business, any of the Trade Secrets of the Company or its affiliates.

6.    Noncompetition Covenant.  Individual acknowledges that he or she will receive valuable training and Confidential Information that he or she otherwise would not receive or have access to but for the rights licensed to Franchisee under the Franchise Agreement.  Individual agrees to the following non-competition covenants:

> A.    Individual covenants that during the term of the Franchise Agreement, Individual will not, either directly or indirectly, for him or herself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in any business that sells or offers to sell bracelets and charms that compete, directly or indirectly, with the PANDORA charm bracelet product line.

> B.    Individual covenants that he or she will not, directly or indirectly, solicit or otherwise attempt to induce, by combining or conspiring with, or attempting to do so, or in any other manner influence any person or entity with whom Company conducts business to terminate or modify his, her, or its business relationship with Company or to compete with Company.

> C.    Individual covenants that he or she will not, for a period of one year after the expiration or termination of this Agreement, regardless of the cause of termination, or within one year of the sale of the Store by Franchisee, either directly or indirectly, for him or herself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have

D-3

any interest in a business that sells or offers to sell bracelets and charms that compete, directly or indirectly, with the PANDORA charm bracelet product line:

      i.      At the premises of the former Store;

      ii.     Within a 15-mile radius of the former Store; or

      iii.    Within a 15-mile radius of the location of any other PANDORA Store, whether franchised or owned by us or our affiliates.

      D.     Individual agrees that the length of time in subpart 6(C) will be tolled for any period during which Individual is in breach of the covenants or any other period during which we seek to enforce this Agreement. The parties agree that each of the foregoing covenants will be construed as independent of any other covenant or provision of this Agreement.

7.     <u>Injunction</u>. Individual hereby acknowledges and agrees that in the event of any breach or threatened breach of this Agreement, the Company shall be authorized and entitled to seek, from any court of competent jurisdiction, preliminary and permanent injunctive relief in addition to any other rights or remedies to which the Company may be entitled. Individual agrees that the Company may obtain such injunctive relief, without posting a bond. Individual's sole remedy in the event of the entry of such injunctive relief shall be dissolution of such injunctive relief, if warranted, upon a hearing duly had; provided, however, that all claims for damages by reason of the wrongful issuance of any such injunction are hereby expressly waived by Individual.

8.     <u>Reasonableness of Restrictions</u>. Individual acknowledges and agrees that the restrictions in this Agreement are reasonable and necessary for the protection of the Confidential Information and Trade Secrets and that any violation of this Agreement would cause substantial and irreparable injury to Company, and that Company would not have entered into a business relationship with Franchisee or the Franchise Agreement without receiving Individual's unrestricted promise to preserve the confidentiality of the Confidential Information and Trade Secrets. In any litigation concerning the entry of any requested injunction against Individual, Individual, for value, voluntarily waives such defenses as Individual might otherwise have under the law of the jurisdiction in which the matter is being litigated relating to any claimed "**prior breach**" on the part of the Company; it being specifically understood and agreed between the parties that no action or lack of action on the part of the Company will entitle or permit Individual to disclose any such Confidential Information or Trade Secrets in any circumstances.

9.     <u>Effect of Waiver</u>. The waiver by Individual or the Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach thereof.

10.    <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of Individual and the Company and their respective heirs, executors, representatives, successors and assigns.

11.    <u>Entire Agreement</u>. This instrument contains the entire agreement of Individual and the Company relating to the matters included in the agreement. It may not be changed verbally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

D-4

12.     Governing Law.  This instrument shall be governed by and construed under the laws of the State of Maryland.

13.     Jurisdiction and Venue.  In the event of a breach or threatened breach by Individual of this Agreement, Individual hereby irrevocably submits to the jurisdiction of the state and federal courts of Maryland, and irrevocably agrees that venue for any action or proceeding shall be in the state and federal courts of Maryland.  Both parties waive any objection to the jurisdiction of these courts or to venue in the state and federal courts of Maryland.  Notwithstanding the foregoing, in the event that the laws of the state where Individual resides prohibit the aforesaid designation of jurisdiction and venue, then such other state's laws shall control.

14.     Severability.  If any provision of this Agreement shall be held, declared or pronounced void, voidable, invalid, unenforceable or inoperative for any reason, by any court of competent jurisdiction, government authority or otherwise, such holding, declaration or pronouncement shall not affect adversely any other provisions of this Agreement that shall otherwise remain in full force and effect.

15.     Attorneys' Fees.  In any action at law or in equity to enforce any of the provisions or rights under this Agreement, the unsuccessful party in such litigation, as determined by the court in a final judgment or decree, shall pay the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such party or parties (including without limitation such costs, expenses and fees on any appeals), and if such successful party shall recover judgment in any such action or proceeding, such costs, expenses and attorneys' fees shall be included as part of such judgment.

**IN WITNESS WHEREOF**, the parties have signed this Agreement on the date first above written.

**COMPANY:**                                              **INDIVIDUAL:**

**Pandora Franchising, LLC.**, a Maryland                 _____
limited liability company

By:_____                       By:_____

_____
        Printed Name

Its:_____

# PANDORA FRANCHISING, LLC

## NONDISCLOSURE AND NONCOMPETITION AGREEMENT

This Nondisclosure and Noncompetition Agreement ("**Agreement**") is made and entered into this 8th day of _MAY_, 2017, by and between **Pandora Franchising, LLC**, a Maryland limited liability company ("**Company**"), located at 250 West Pratt Street, Baltimore, MD 21201 and Rahul Aswani, ("**Individual**"), who resides at C/Princesa Teguise 21, 35510 Tias Lanzarote, Canary Islands, Spain. All initially capitalized terms not otherwise defined shall have the meanings specified in the Franchise Agreement as defined below.

## RECITALS

A.      The Company is engaged in the business of selling franchises for the operation of retail businesses selling a unique line of custom jewelry ("**Franchise Business**"). The Franchise Businesses are operated under the Company's trademark "**PANDORA®**" and other service marks, trademarks, logo types, architectural designs, trade dress and other commercial symbols (collectively, the "**Marks**");

B.      The Company has developed methods for establishing, operating and promoting Franchise Businesses in accordance with the Company's distinctive business format, plans, methods, data, processes, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, Marks and information and know-how of the Company ("**Confidential Information**" and "**Trade Secrets**") and such Confidential Information and Trade Secrets as may be further developed from time to time by the Company ("**System**");

C.      The Company and its affiliates have established substantial goodwill and an excellent reputation with respect to the quality of unique jewelry items and other products and services available, which goodwill and reputation have been and will continue to be of major benefit to the Company;

D.      Individual is an owner, shareholder, member, partner, officer, and/or director of MA Group, S.A. ("**Franchisee**") and will receive Confidential Information and Trade Secrets in such capacity.

E.      Individual agrees to the terms of this Agreement as partial consideration for the Company's willingness to allow Franchisee to become a Franchisee of the Company and to have access to the Company's Confidential Information and Trade Secrets.

NOW THEREFORE, in consideration of the foregoing, the mutual promises contained within and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Individual and the Company, intending legally to be bound, agree as follows:

1.      <u>Definitions</u>.

(a)      "**Competitive Business**" as used in this Agreement means any business that sells or offers to sell bracelets and charms that compete, directly or indirectly, with the PANDORA charm bracelet product line. For the sake of clarity, Alex and Ani, LLC and Swarovski shall each be considered a Competitive Business.

(b) **"Confidential Information"** shall mean without limitation, all knowledge, know-how, standards, formulas, methods and procedures related to the establishment and operation of the Franchise Business and includes all records pertaining to customers, suppliers, and other service providers of, and/or related in any way to, the Franchise Business including, without limitation, all databases (whether in print, electronic or other form), all names, addresses, phone numbers, e-mail addresses, customer purchase records, mail lists, manuals, promotional and marketing materials, marketing strategies and any other data and information that the Company or its affiliates designates as confidential including all information contained in the Company's Operations Manual, which may be provided as one or more separate manuals, written instructional guides, CD Rom, or other communications from the Company or its affiliates, which may be changed or supplemented from time to time.

(c) **"Franchise Agreement"** shall mean the franchise agreement between Company and MA Group, S.A. (**"Franchisee"**) dated _____MAY 8_____, 2017, relating to a Pandora store at Oakland Mall, Guatemala City, Guatemala, as amended or renewed from time to time.

(d) **"Store"** shall have the meaning defined in the Franchise Agreement.

(e) **"Term"** shall have the meaning defined in the Franchise Agreement.

(f) **"Trade Secret(s)"** shall mean information, including a formula, customer lists, pattern, compilation, program, device, method, technique or process related to the Franchise Business that both derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2. <u>Confidential Information and Trade Secrets</u>. Individual and the Company acknowledge that the Confidential Information and Trade Secrets that are developed and utilized in connection with the operation of the Franchise Business is unique and the exclusive property of the Company or its affiliates. Individual acknowledges that any unauthorized disclosure or use of the Confidential Information and Trade Secrets would be wrongful and would cause irreparable injury and harm to the Company or its affiliates. Individual further acknowledges that the Company or its affiliates has expended a great amount of effort and money in obtaining and developing the Confidential Information and Trade Secrets, that the Company or its affiliates has taken numerous precautions to guard the secrecy of the Confidential Information and Trade Secrets, and that it would be very costly for competitors to acquire or duplicate the Confidential Information and Trade Secrets.

3. <u>Nondisclosure of Confidential Information</u>. During the Term and any renewal Term of the Franchise Agreement and for all periods after the Term and any renewal Term of the Franchise Agreement, Individual shall not at any time, publish, disclose, divulge or in any manner communicate to any person, firm, corporation, association, partnership or any other entity whatsoever or use, directly or indirectly, for its own benefit or for the benefit of any person, firm,

corporation or other entity other than for the use of the Company or the Franchise Business, any of the Confidential Information of the Company or its affiliates.

4.      Exceptions to Disclosing Confidential Information.  Notwithstanding the foregoing, the restrictions on the disclosure and use of the Confidential Information will not apply to the following: (a) information that was in the public domain prior to being communicated to Individual through no fault of Franchisee or Individual; (b) information that entered the public domain after it was communicated to Individual through no fault of Franchisee or Individual; (c) information that was in Individual's possession free of any obligation of confidence at the time it was communicated to Franchisee or Individual; or (d) the disclosure of the Confidential Information in judicial or administrative proceedings to the extent that Individual or Franchisee is legally compelled to disclose the information, if Individual or Franchisee has notified the Company before disclosure and used Individual or Franchisee's best efforts, and afforded the Company the opportunity, to obtain an appropriate protective order or other assurance satisfactory to the Company of confidential treatment for the information required to be so disclosed.

5.      Nondisclosure of Trade Secrets.  During the Term and any renewal Term of the Franchise Agreement and for as long as such information constitutes a Trade Secret, Individual shall not at any time, publish, disclose, divulge or in any manner communicate to any person, firm, corporation, association, partnership or any other entity whatsoever or use, directly or indirectly, for its own benefit or for the benefit of any person, firm, corporation or other entity other than for the use of the Company or the Franchise Business, any of the Trade Secrets of the Company or its affiliates.

6.      Noncompetition Covenant.  Individual acknowledges that he or she will receive valuable training and Confidential Information that he or she otherwise would not receive or have access to but for the rights licensed to Franchisee under the Franchise Agreement.  Individual agrees to the following non-competition covenants:

A.      Individual covenants that during the term of the Franchise Agreement, Individual will not, either directly or indirectly, for him or herself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in any business that sells or offers to sell bracelets and charms that compete, directly or indirectly, with the PANDORA charm bracelet product line.

B.      Individual covenants that he or she will not, directly or indirectly, solicit or otherwise attempt to induce, by combining or conspiring with, or attempting to do so, or in any other manner influence any person or entity with whom Company conducts business to terminate or modify his, her, or its business relationship with Company or to compete with Company.

C.      Individual covenants that he or she will not, for a period of one year after the expiration or termination of this Agreement, regardless of the cause of termination, or within one year of the sale of the Store by Franchisee, either directly or indirectly, for him or herself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in a business that sells or offers to sell bracelets and charms that compete, directly or indirectly, with the PANDORA charm bracelet product line:

i.    At the premises of the former Store;

ii.    Within a 15-mile radius of the former Store; or

iii.    Within a 15-mile radius of the location of any other PANDORA Store, whether franchised or owned by us or our affiliates.

D.    Individual agrees that the length of time in subpart 6(C) will be tolled for any period during which Individual is in breach of the covenants or any other period during which we seek to enforce this Agreement. The parties agree that each of the foregoing covenants will be construed as independent of any other covenant or provision of this Agreement.

7.    Injunction. Individual hereby acknowledges and agrees that in the event of any breach or threatened breach of this Agreement, the Company shall be authorized and entitled to seek, from any court of competent jurisdiction, preliminary and permanent injunctive relief in addition to any other rights or remedies to which the Company may be entitled. Individual agrees that the Company may obtain such injunctive relief, without posting a bond. Individual's sole remedy in the event of the entry of such injunctive relief shall be dissolution of such injunctive relief, if warranted, upon a hearing duly had; provided, however, that all claims for damages by reason of the wrongful issuance of any such injunction are hereby expressly waived by Individual.

8.    Reasonableness of Restrictions. Individual acknowledges and agrees that the restrictions in this Agreement are reasonable and necessary for the protection of the Confidential Information and Trade Secrets and that any violation of this Agreement would cause substantial and irreparable injury to Company, and that Company would not have entered into a business relationship with Franchisee or the Franchise Agreement without receiving Individual's unrestricted promise to preserve the confidentiality of the Confidential Information and Trade Secrets. In any litigation concerning the entry of any requested injunction against Individual, Individual, for value, voluntarily waives such defenses as Individual might otherwise have under the law of the jurisdiction in which the matter is being litigated relating to any claimed "**prior breach**" on the part of the Company; it being specifically understood and agreed between the parties that no action or lack of action on the part of the Company will entitle or permit Individual to disclose any such Confidential Information or Trade Secrets in any circumstances.

9.    Effect of Waiver. The waiver by Individual or the Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach thereof.

10.    Binding Effect. This Agreement shall be binding upon and inure to the benefit of Individual and the Company and their respective heirs, executors, representatives, successors and assigns.

11.    Entire Agreement. This instrument contains the entire agreement of Individual and the Company relating to the matters included in the agreement. It may not be changed verbally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

12. <u>Governing Law</u>. This instrument shall be governed by and construed under the laws of the State of Maryland.

13. <u>Jurisdiction and Venue</u>. In the event of a breach or threatened breach by Individual of this Agreement, Individual hereby irrevocably submits to the jurisdiction of the state and federal courts of Maryland, and irrevocably agrees that venue for any action or proceeding shall be in the state and federal courts of Maryland. Both parties waive any objection to the jurisdiction of these courts or to venue in the state and federal courts of Maryland. Notwithstanding the foregoing, in the event that the laws of the state where Individual resides prohibit the aforesaid designation of jurisdiction and venue, then such other state's laws shall control.

14. <u>Severability</u>. If any provision of this Agreement shall be held, declared or pronounced void, voidable, invalid, unenforceable or inoperative for any reason, by any court of competent jurisdiction, government authority or otherwise, such holding, declaration or pronouncement shall not affect adversely any other provisions of this Agreement that shall otherwise remain in full force and effect.

15. <u>Attorneys' Fees</u>. In any action at law or in equity to enforce any of the provisions or rights under this Agreement, the unsuccessful party in such litigation, as determined by the court in a final judgment or decree, shall pay the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such party or parties (including without limitation such costs, expenses and fees on any appeals), and if such successful party shall recover judgment in any such action or proceeding, such costs, expenses and attorneys' fees shall be included as part of such judgment.

**IN WITNESS WHEREOF**, the parties have signed this Agreement on the date first above written.

| COMPANY: | INDIVIDUAL: |
|---|---|
| **Pandora Franchising, LLC.**, a Maryland limited liability company | Rahul Aswani |
| By: _____ | _____ |
| TRACEY GRIFFIN | |
| Printed Name | |
| Its: TREASURER | |

5

# PANDORA FRANCHISING, LLC

## NONDISCLOSURE AND NONCOMPETITION AGREEMENT

This Nondisclosure and Noncompetition Agreement ("**Agreement**") is made and entered into this _8th_ day of _MAY_ , 2017, by and between **Pandora Franchising, LLC**, a Maryland limited liability company ("**Company**"), located at 250 West Pratt Street, Baltimore, MD 21201 and Rajesh Mohinani, ("**Individual**"), who resides at Calle Colombia, Edificio Allure Piso 41A, Panama City, Panama. All initially capitalized terms not otherwise defined shall have the meanings specified in the Franchise Agreement as defined below.

### RECITALS

A.      The Company is engaged in the business of selling franchises for the operation of retail businesses selling a unique line of custom jewelry ("**Franchise Business**"). The Franchise Businesses are operated under the Company's trademark "**PANDORA®**" and other service marks, trademarks, logo types, architectural designs, trade dress and other commercial symbols (collectively, the "**Marks**");

B.      The Company has developed methods for establishing, operating and promoting Franchise Businesses in accordance with the Company's distinctive business format, plans, methods, data, processes, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, Marks and information and know-how of the Company ("**Confidential Information**" and "**Trade Secrets**") and such Confidential Information and Trade Secrets as may be further developed from time to time by the Company ("**System**");

C.      The Company and its affiliates have established substantial goodwill and an excellent reputation with respect to the quality of unique jewelry items and other products and services available, which goodwill and reputation have been and will continue to be of major benefit to the Company;

D.      Individual is an owner, shareholder, member, partner, officer, and/or director of MA Group, S.A. ("**Franchisee**") and will receive Confidential Information and Trade Secrets in such capacity.

E.      Individual agrees to the terms of this Agreement as partial consideration for the Company's willingness to allow Franchisee to become a Franchisee of the Company and to have access to the Company's Confidential Information and Trade Secrets.

NOW THEREFORE, in consideration of the foregoing, the mutual promises contained within and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Individual and the Company, intending legally to be bound, agree as follows:

1.      Definitions.

(a)      "**Competitive Business**" as used in this Agreement means any business that sells or offers to sell bracelets and charms that compete, directly or indirectly, with the PANDORA charm bracelet product line. For the sake of clarity, Alex and Ani, LLC and Swarovski shall each be considered a Competitive Business.

(b)     **"Confidential Information"** shall mean without limitation, all knowledge, know-how, standards, formulas, methods and procedures related to the establishment and operation of the Franchise Business and includes all records pertaining to customers, suppliers, and other service providers of, and/or related in any way to, the Franchise Business including, without limitation, all databases (whether in print, electronic or other form), all names, addresses, phone numbers, e-mail addresses, customer purchase records, mail lists, manuals, promotional and marketing materials, marketing strategies and any other data and information that the Company or its affiliates designates as confidential including all information contained in the Company's Operations Manual, which may be provided as one or more separate manuals, written instructional guides, CD Rom, or other communications from the Company or its affiliates, which may be changed or supplemented from time to time.

(c)     **"Franchise Agreement"** shall mean the franchise agreement between Company and MA Group, S.A. (**"Franchisee"**) dated _MAy 8_ , 2017, relating to a Pandora store at Oakland Mall, Guatemala City, Guatemala, as amended or renewed from time to time.

(d)     **"Store"** shall have the meaning defined in the Franchise Agreement.

(e)     **"Term"** shall have the meaning defined in the Franchise Agreement.

(f)     **"Trade Secret(s)"** shall mean information, including a formula, customer lists, pattern, compilation, program, device, method, technique or process related to the Franchise Business that both derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2.     Confidential Information and Trade Secrets.  Individual and the Company acknowledge that the Confidential Information and Trade Secrets that are developed and utilized in connection with the operation of the Franchise Business is unique and the exclusive property of the Company or its affiliates.   Individual acknowledges that any unauthorized disclosure or use of the Confidential Information and Trade Secrets would be wrongful and would cause irreparable injury and harm to the Company or its affiliates.  Individual further acknowledges that the Company or its affiliates has expended a great amount of effort and money in obtaining and developing the Confidential Information and Trade Secrets, that the Company or its affiliates has taken numerous precautions to guard the secrecy of the Confidential Information and Trade Secrets, and that it would be very costly for competitors to acquire or duplicate the Confidential Information and Trade Secrets.

3.     Nondisclosure of Confidential Information.  During the Term and any renewal Term of the Franchise Agreement and for all periods after the Term and any renewal Term of the Franchise Agreement, Individual shall not at any time, publish, disclose, divulge or in any manner communicate to any person, firm, corporation, association, partnership or any other entity whatsoever or use, directly or indirectly, for its own benefit or for the benefit of any person, firm,

corporation or other entity other than for the use of the Company or the Franchise Business, any of the Confidential Information of the Company or its affiliates.

4.    Exceptions to Disclosing Confidential Information. Notwithstanding the foregoing, the restrictions on the disclosure and use of the Confidential Information will not apply to the following: (a) information that was in the public domain prior to being communicated to Individual through no fault of Franchisee or Individual; (b) information that entered the public domain after it was communicated to Individual through no fault of Franchisee or Individual; (c) information that was in Individual's possession free of any obligation of confidence at the time it was communicated to Franchisee or Individual; or (d) the disclosure of the Confidential Information in judicial or administrative proceedings to the extent that Individual or Franchisee is legally compelled to disclose the information, if Individual or Franchisee has notified the Company before disclosure and used Individual or Franchisee's best efforts, and afforded the Company the opportunity, to obtain an appropriate protective order or other assurance satisfactory to the Company of confidential treatment for the information required to be so disclosed.

5.    Nondisclosure of Trade Secrets. During the Term and any renewal Term of the Franchise Agreement and for as long as such information constitutes a Trade Secret, Individual shall not at any time, publish, disclose, divulge or in any manner communicate to any person, firm, corporation, association, partnership or any other entity whatsoever or use, directly or indirectly, for its own benefit or for the benefit of any person, firm, corporation or other entity other than for the use of the Company or the Franchise Business, any of the Trade Secrets of the Company or its affiliates.

6.    Noncompetition Covenant. Individual acknowledges that he or she will receive valuable training and Confidential Information that he or she otherwise would not receive or have access to but for the rights licensed to Franchisee under the Franchise Agreement. Individual agrees to the following non-competition covenants:

> A.    Individual covenants that during the term of the Franchise Agreement, Individual will not, either directly or indirectly, for him or herself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in any business that sells or offers to sell bracelets and charms that compete, directly or indirectly, with the PANDORA charm bracelet product line.

> B.    Individual covenants that he or she will not, directly or indirectly, solicit or otherwise attempt to induce, by combining or conspiring with, or attempting to do so, or in any other manner influence any person or entity with whom Company conducts business to terminate or modify his, her, or its business relationship with Company or to compete with Company.

> C.    Individual covenants that he or she will not, for a period of one year after the expiration or termination of this Agreement, regardless of the cause of termination, or within one year of the sale of the Store by Franchisee, either directly or indirectly, for him or herself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in a business that sells or offers to sell bracelets and charms that compete, directly or indirectly, with the PANDORA charm bracelet product line:

3

        i.      At the premises of the former Store;

        ii.     Within a 15-mile radius of the former Store; or

        iii.    Within a 15-mile radius of the location of any other PANDORA Store, whether franchised or owned by us or our affiliates.

D.      Individual agrees that the length of time in subpart 6(C) will be tolled for any period during which Individual is in breach of the covenants or any other period during which we seek to enforce this Agreement. The parties agree that each of the foregoing covenants will be construed as independent of any other covenant or provision of this Agreement.

7.     Injunction.  Individual hereby acknowledges and agrees that in the event of any breach or threatened breach of this Agreement, the Company shall be authorized and entitled to seek, from any court of competent jurisdiction, preliminary and permanent injunctive relief in addition to any other rights or remedies to which the Company may be entitled.  Individual agrees that the Company may obtain such injunctive relief, without posting a bond. Individual's sole remedy in the event of the entry of such injunctive relief shall be dissolution of such injunctive relief, if warranted, upon a hearing duly had; provided, however, that all claims for damages by reason of the wrongful issuance of any such injunction are hereby expressly waived by Individual.

8.     Reasonableness of Restrictions.  Individual acknowledges and agrees that the restrictions in this Agreement are reasonable and necessary for the protection of the Confidential Information and Trade Secrets and that any violation of this Agreement would cause substantial and irreparable injury to Company, and that Company would not have entered into a business relationship with Franchisee or the Franchise Agreement without receiving Individual's unrestricted promise to preserve the confidentiality of the Confidential Information and Trade Secrets.  In any litigation concerning the entry of any requested injunction against Individual, Individual, for value, voluntarily waives such defenses as Individual might otherwise have under the law of the jurisdiction in which the matter is being litigated relating to any claimed **"prior breach"** on the part of the Company; it being specifically understood and agreed between the parties that no action or lack of action on the part of the Company will entitle or permit Individual to disclose any such Confidential Information or Trade Secrets in any circumstances.

9.     Effect of Waiver.  The waiver by Individual or the Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach thereof.

10.    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of Individual and the Company and their respective heirs, executors, representatives, successors and assigns.

11.    Entire Agreement.  This instrument contains the entire agreement of Individual and the Company relating to the matters included in the agreement.  It may not be changed verbally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

12.   Governing Law.  This instrument shall be governed by and construed under the laws of the State of Maryland.

13.   Jurisdiction and Venue.  In the event of a breach or threatened breach by Individual of this Agreement, Individual hereby irrevocably submits to the jurisdiction of the state and federal courts of Maryland, and irrevocably agrees that venue for any action or proceeding shall be in the state and federal courts of Maryland.  Both parties waive any objection to the jurisdiction of these courts or to venue in the state and federal courts of Maryland.  Notwithstanding the foregoing, in the event that the laws of the state where Individual resides prohibit the aforesaid designation of jurisdiction and venue, then such other state's laws shall control.

14.   Severability.  If any provision of this Agreement shall be held, declared or pronounced void, voidable, invalid, unenforceable or inoperative for any reason, by any court of competent jurisdiction, government authority or otherwise, such holding, declaration or pronouncement shall not affect adversely any other provisions of this Agreement that shall otherwise remain in full force and effect.

15.   Attorneys' Fees.  In any action at law or in equity to enforce any of the provisions or rights under this Agreement, the unsuccessful party in such litigation, as determined by the court in a final judgment or decree, shall pay the successful party or parties all costs, expenses and reasonable attorneys' fees incurred by such party or parties (including without limitation such costs, expenses and fees on any appeals), and if such successful party shall recover judgment in any such action or proceeding, such costs, expenses and attorneys' fees shall be included as part of such judgment.


**IN WITNESS WHEREOF**, the parties have signed this Agreement on the date first above written.

COMPANY:                                          INDIVIDUAL:

**Pandora Franchising, LLC., a Maryland**          Rajesh Mohinani
limited liability company

By: _____              _____
        TRACEY GRIFFIN
              Printed Name

Its: _____TREASURER_____

5